**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

DENISON UNIVERSITY, KENYON
COLLEGE, OHIO WESLEYAN
UNIVERSITY, AND THE COLLEGE OF
WOOSTER,

      **Plaintiffs,**

    vs.

CERTAIN UNDERWRITERS AT LLOYD'S
LONDON SUBSCRIBING TO POLICY
NUMBER W2205F200301, GUIDEONE
NATIONAL INSURANCE COMPANY,
COLONY INSURANCE COMPANY, ACE
AMERICAN INSURANCE COMPANY,
STARR SURPLUS LINES INSURANCE
COMPANY, ARCH SPECIALTY
INSURANCE COMPANY, EVANSTON
INSURANCE COMPANY, CERTAIN
UNDERWRITERS AT LLOYD'S LONDON
SUBSCRIBING TO POLICY NUMBER
B080110908U20, ATEGRITY SPECIALTY
INSURANCE COMPANY, HDI GLOBAL
INSURANCE COMPANY, WESTPORT
INSURANCE CORPORATION, TOKIO
MARINE AMERICA INSURANCE
COMPANY, ENDURANCE AMERICAN
SPECIALTY INSURANCE COMPANY, THE
PRINCETON EXCESS AND SURPLUS
LINES INSURANCE COMPANY, MITSUI
SUMITOMO INSURANCE COMPANY OF
AMERICA, AND HOMELAND
INSURANCE COMPANY OF NEW YORK,

      **Defendants**.

NO. 2:21-cv-01010

**COMPLAINT**

**JURY TRIAL DEMANDED**

      Plaintiffs Denison University ("Denison"), Kenyon College ("Kenyon"), Ohio Wesleyan

University ("OWU"), and The College of Wooster ("Wooster") (collectively, the "EIIA Members"

or "Plaintiffs"), for their Complaint for breach of contract, declaratory judgment and damages

against Defendants Certain Underwriters at Lloyd's London Subscribing to Policy Number

W2205F200301 ("Beazley"),[1] GuideOne National Insurance Company ("GuideOne"), Colony Insurance Company ("Colony"), Ace American Insurance Company ("Ace"), Starr Surplus Lines Insurance Company ("Starr"), Arch Specialty Insurance Company ("Arch), Evanston Insurance Company ("Evanston"), Certain Underwriters at Lloyd's London Subscribing to Policy Number B080110908U20,[2] Ategrity Specialty Insurance Company ("Ategrity"), HDI Global Insurance Company ("HDI"), Westport Insurance Corporation ("Westport"), Tokio Marine America Insurance Company ("Tokio Marine"), Endurance American Specialty Insurance Company ("Endurance"), The Princeton Excess And Surplus Lines Insurance Company ("Princeton"), Mitsui Sumitomo Insurance Company Of America ("Mitsui"), and Homeland Insurance Company Of New York ("Homeland") (collectively, "Defendant Insurers" or the "Insurers"), alleges as follows:

## NATURE OF THE ACTION AND RELIEF SOUGHT

1.    This action arises out of Defendant Insurers' refusal to acknowledge coverage for the EIIA Members' losses arising from the SARS-CoV-2 virus (the "Coronavirus") and the disease that it causes, Coronavirus Disease 2019 ("COVID-19").

2.    The EIIA Members' interest in their respective covered property has been impacted adversely by COVID-19.  The EIIA Members have suffered covered losses under a program of "all-risk" commercial property insurance policies that Defendant Insurers sold to the EIIA Members (the "Policies"), as detailed further herein.  The policies adopt a master policy form (the

---

[1]  Made up of Lloyd's Underwriter Syndicate No. 2623 (82%) and Lloyd's Underwriter Syndicate No. 623 (18%).

[2]  With respect to the excess layer $40M x $10M:  Lloyd's Underwriter Syndicate No. 1414 ASC (5%), Lloyd's Underwriter Syndicate No. 2988 BRIT (0.75%), Lloyd's Underwriter Syndicate No. 2987 BRIT (5.75%), Lloyd's Underwriter Syndicate No. 1967 WRB (8%), Lloyd's Underwriter Syndicate No. 2015 CHN (4%), Lloyd's Underwriter Syndicate No. 1183 TAL (2%).  With respect to the excess layer $100M x $50M: Lancashire Insurance Co. (UK) Ltd, LIRMA L0205 (10%), Lloyd's Syndicate Underwriter No. 3902 NOA (3%), Convex Insurance UK Limited, LIRMA C9800 (5%), Aggregate Offline Market (1.5%).  With respect to the excess layer $150M x $250M: Lloyd's Underwriter Syndicate No. 1414 ASC (5%).

"Policy"), with $1.2 billion per occurrence limits in primary and excess coverage, effective from March 1, 2020 to March 1, 2021.

3.     The Policy "insures against all risk of direct physical loss of or damage to property . . . except as hereinafter excluded[.]" It provides coverage for property damage losses, time element and/or business interruption losses, and other losses.

4.     The Policy also insures "[l]oss resulting from necessary interruption of business . . . caused by loss, damage, or destruction . . . ."

5.     Virus, communicable disease and pandemics are not excluded causes of loss under the Policy.

6.     Indeed, the Policy expressly includes "Communicable Disease" coverage (in the Policy's "Coverage Extensions" section), for property damage for "direct physical loss or damage to insured property caused by or resulting from a . . . communicable disease event at an insured location[,]" and "costs to test, monitor, contain . . . disinfect . . . insured property."

7.     Further, and without any requirement to demonstrate physical loss or damage, the Policy expressly includes "Interruption by Communicable Disease" coverage (in the Policy's "Coverage Extensions" section), for business interruption "if the interruption is caused by order of an authorized governmental agency enforcing any law or ordinance regulating communicable diseases or by recommendation of the Center for Disease Control (CDC) or that such portions of the location are declared uninhabitable due to the threat of the spread of communicable disease, prohibiting access to those portions of the Location."

8.     The "Interruption by Communicable Disease" coverage also provides coverage for "the reasonable and necessary cost incurred for the cleanup, removal and disposal of the actual not suspected presence of substances(s) [sic] causing the spread of such communicable disease and to restore the locations in a manner so as to satisfy such authorized governmental agency."

9.     The phrases "all risk of direct physical loss of or damage to property," "direct physical loss or damage," and "loss, damage, or destruction" are not defined or broadly applicable in the Policy.  In plain English, they denote at least the following meanings: (1) physical damage

3

to that property; (2) the structural alteration of that property; (3) the interaction of an external physical substance or force with the property, including its attachment to the surface of that property, rendering the property unfit, unsafe or uninhabitable for normal use or otherwise negatively affecting the property's usability; or (4) the loss of use or the loss of functional use, whether in whole or in part, of that property. Further, the grants of coverage for Communicable Disease, Communicable Disease Interruption, and other coverage extensions, do not require a demonstration of "physical loss or damage" or "loss, damage or destruction" or modify its meaning to apply to the events presented by the COVID-19 pandemic.

10.     The toll of the Coronavirus and COVID-19 on lives, property, and businesses in Ohio, the United States and around the world has been unprecedented and is among the worst public health and economic catastrophes of the last 100 years.

11.     Indeed, to date COVID-19 has killed over 17,502 Ohioans,[3] over 500,000 Americans[4] and is now the third-leading cause of death in this country, surpassed only by heart disease and cancer.[5] At its peak, over 4,000 Americans were perishing per day from COVID-19.[6] Thousands of Americans are still dying daily.[7]

12.     The loss or damage to property and the economic devastation wrought by the Coronavirus and COVID-19 is unprecedented. The Coronavirus and COVID-19 could result in

---

[3]  *Data Dashboard*, Ohio Department of Health Services (updated Mar. 5, 2021), https://coronavirus.ohio.gov/wps/portal/gov/covid-19/dashboards (last visited Mar. 9, 2021).

[4]  *Coronavirus Disease 2019 (COVID-19),* CDC, (updated Feb. 22, 2021), https://covid.cdc.gov/covid-datatracker/#datatracker-home (last visited Feb. 22, 2021).

[5]  Gary Stix and Youyou Zhou, *COVID-19 Is Now the Third Leading Cause of Death in the U.S.*, SCI. AM., (Oct. 8, 2020), https://www.scientificamerican.com/article/covid-19-is-now-the-third-leading-cause-of-death-in-the-u-s1/ (last visited Feb. 12, 2021).

[6]  Eugene Garcia, Lisa Marie Pane and Thalia Beaty, *U.S. tops 4,000 daily deaths from coronavirus for 1st time*, AP NEWS, (Jan. 9, 2021), https://apnews.com/article/us-coronavirus-death-4000-daily-16c1f136921c7e98ec83289942322ee4 (last visited Feb. 12, 2021).

[7]  Coronavirus in the U.S.: Latest Map and Case Count, N.Y. TIMES, (updated Feb. 12, 2021), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited Feb. 12, 2021); Johns Hopkins Medicine, *Coronavirus Second Wave? Why Cases Increase*, (updated Nov. 17, 2020), https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/first-and-second-waves-of-coronavirus (last visited Feb. 17, 2021).

net losses starting at $3.2 trillion and reaching as much as $4.8 trillion in U.S. real gross domestic product over two years.[8]

13.    The impact of the Coronavirus and COVID-19 on Ohio is also devastating, and Ohio was leading the nation's response to COVID-19.[9]

14.    As of February 28, 2021, Ohio has reported over 979,725 COVID-19 cases, including more than 17,500 deaths.[10]

15.    While most sectors of the economy are struggling, the nation's colleges and universities have been particularly hard hit.[11] Even small reductions in student enrollment can lead to significant losses at colleges and universities.

16.    A June 2020 survey of 271 college and university chief business officers conducted by Inside Higher ED found that most institutions had already incurred more than $2 million in unanticipated budget costs relating to the Coronavirus and COVID-19, with one in five reporting costs of more than $5 million, and one in ten reporting costs of at least $10 million.[12] The U.S. Labor Department estimates that at least 650,000 workers at American academic institutions are no longer employed – or one in eight workers in academia.[13]

---

[8]  Emily Gersema, *Business closures and partial reopenings due to COVID-19 could cost the U.S. trillions*, USC News (Nov. 30, 2020), https://news.usc.edu/178979/business-closures-covid-19-pandemic-united-states-gdp-losses/#:~:text=The%20COVID%2D19%20pandemic%20could, years%2C%20a%20USC%20study%20finds (last visited Feb. 17, 2021).

[9]  Jessie Balmert and Jackie Borchardt, *Why Ohio is leading US coronavirus response*, THE COLUMBUS DISPATCH (Mar. 14, 2020), https://www.dispatch.com/news/20200314/why-ohio-is-leading-us-coronavirus-response (last visited Mar. 9, 2021); Andrew J. Tobias, *Ohio Gov. Mike DeWine's clear coronavirus response seen as contrast to White House approach*, Cleveland.com (Mar. 13, 2020), https://www.cleveland.com/open/2020/03/ohio-gov-mike-dewines-clear-coronavirus-response-seen-as-contrast-to-white-house-approach.html (last visited Mar. 9, 2021).

[10] *Data Dashboard*, Ohio Department of Health Services (updated Mar. 5, 2021), https:// coronavirus.ohio.gov/wps/portal/gov/covid-19/dashboards (last visited Mar. 9, 2021).

[11] *As Campuses Become COVID-19 Hot Spots, Colleges Strain Under Financial Pressures*, NPR (Sep. 16, 2020), https://www.npr.org/2020/09/16/913500758/as-campuses-become-covid-hotspots-colleges-strain-under-financial-pressures (last visited March 1, 2021).

[12] *COVID-19's Forceful Financial Hit:  A Survey of Business Officers*, Insider Higher ED (Jul. 10, 2020), https://www.insidehighered.com/news/survey/covid-19s-forceful-financial-hit-survey-business-officers (last visited Mar. 1, 2021).

[13] A Brutal Tally:  Higher Ed Lost 650,000 Jobs Last Year, The Chronicle of Higher Education (Feb. 5, 2021), https://www.chronicle.com/article/a-brutal-tally-higher-ed-lost-650-000-jobs-last-year (last visited Mar. 1, 2021).

17.     Ohio lost a staggering 823,700 jobs in April 2020 alone.[14]  The unemployment rate has spiked from 4.1% in February 2020 to 16.8% in April 2020.  *Id.*  Over the nine weeks before May 22, 2020, "1,215,756 Ohioans filed initial jobless claims, exceeding the combined total for the previous three years, and comprising more than a fifth of working Ohioans."  *Id.*

18.     Colleges and universities are often anchor employers for their counties and communities – and that is clearly true with Wooster, Denison, Kenyon, and OWU – as these institutions are responsible for the livelihood and security of key parts of the counties in which they reside.

19.     Ohio is also expected to suffer substantial revenue declines as a result of COVID-19's impact on Ohio's economy.  From March to May of 2020, tax revenue was down 18% in Ohio compared with 2019.[15]  For 2021, Ohio's budget shortfall is projected at $2.3 billion, reflecting a 9% drop in pre-COVID-19 revenue projections.[16]

20.     The EIIA Members have suffered as a result of the Coronavirus and COVID-19.

21.     Rather than stand by their insureds and honor their obligations under the Policy, Defendant Insurers turned their backs on the EIIA Members, denying the coverage claimed under the Policy, and forcing the EIIA Members to turn to this Court for relief.

22.     The EIIA Members are part of Educational & Institutional Insurance Administrators, Inc. ("EIIA"), a consortium of private colleges, universities, and seminaries committed to protecting the promise of higher education.  EIIA was created in the 1960's to help historically black colleges and universities connected with the Methodist Church purchase insurance during a period of extreme prejudice and racial injustice.  Other schools that shared a

---

[14] *JobWatch: Record number of Ohioans laid off amid pandemic*, Policy Matters Ohio (May 22, 2020), https://www.policymattersohio.org/research-policy/fair-economy/work-wages/job-watch/jobwatch-record-number-of-ohioans-laid-off-amid-pandemic (last visited Mar. 1, 2021).

[15] *Ohio Built Up Savings Over The Past Few Years.  COVID-19 Will Wipe Out Much Of That*, NPR (Aug. 3, 2020), https://www.npr.org/2020/08/03/895384643/ohio-built-up-savings-over-the-past-few-years-covid-19-will-wipe-out-much-of-tha (last visited Mar. 1, 2021).

[16] *State Budget Watch*, Center on Budget and Policy Priorities (Nov. 6, 2020), https://www.cbpp.org/research/state-budget-and-tax/states-grappling-with-hit-to-tax-collections (last visited Mar. 1, 2021).

6

vision of racial equality joined the consortium.  Many of the member schools are still faith based, and a number were faith based at their founding but no longer are.

23.     The EIIA Members are devoted to educating the next generation and Defendant Insurers' actions, if left unremedied, threaten the EIIA Members' ability to continue their vital mission.

24.     The EIIA Members were all founded in the early 1800s.  They are located in Ohio and are ranked among the top liberal arts colleges in the United States.

25.     Wooster is a private liberal arts college located in Wooster, Ohio.

26.     Denison is a private liberal arts college located in Granville, Ohio.

27.     Denison also owns the Granville Inn, a nearly 100-year-old hotel and inn, and the Denison Golf Club, recognized as one of the top golf facilities in Central Ohio.  Along with the university, the inn and golf course were required to close and/or substantially limit their operations as a result of the Coronavirus, COVID-19 and governmental orders, and incurred substantial costs and losses as a result.

28.     Kenyon is a private liberal arts college located in Gambier, Ohio.

29.     Kenyon also owns the Kenyon Inn & Restaurant, which offers lodging and dining in Knox County, on Kenyon's campus.  Along with the college, the inn was required to close and/or substantially limit their operations as a result of the Coronavirus, COVID-19 and governmental orders, and incurred substantial costs and losses as a result.

30.     OWU is a private liberal arts college located in Delaware, Ohio.

31.     In mid-March 2020, the Coronavirus and COVID-19 struck Ohio hard.

32.     By the end of March 2020, there were nearly 2,200 confirmed cases of, and 55 deaths attributable to, the Coronavirus and COVID-19.[17]  The rate of daily new cases continued to

---

[17] Randy Ludlow, *Coronavirus: Ohio cases nearly up to 2,200 with 55 deaths*, CantonRep (Mar. 31, 2020), https://www.cantonrep.com/news/20200331/coronavirus-ohio-cases-nearly-up-to-2200-with-55-deaths (last visited Mar. 9, 2021).

grow thereafter, with the 21-day average exceeding 10,000 new cases a day in December 2020.[18] *Id.* In April 2020, Ohio's "positivity rate," the percentage of tests for COVID-19 that are positive, reached a high of 36%.[19] In 2021, Ohio's positivity rate has remained relatively steady at over 9%.[20]

33.    The Coronavirus and COVID-19 have decimated lives and businesses, causing widespread loss or damage throughout the United States, Ohio and the counties where the EIIA Members are located. The Coronavirus and COVID-19 have devastated the EIIA Members' property and business by causing loss or damage to its property and other loss of the type insured under the Policy.

34.    The EIIA Members have experienced loss or damage to their property in at least four ways: (1) through the certain or virtually certain presence of COVID-19 and/or the Coronavirus throughout their property, in the air or on surfaces (whether in droplet nuclei, aerosols, droplets or otherwise); (2) through state, local and agency governmental orders, including Center for Disease Control recommendations, that dramatically limited the EIIA Members' use of their property (including, but not limited to, ordering the closure of non-essential functions and prohibiting in-person learning), causing the EIIA Members to lose the total or partial normal use and function of their campuses and other property; (3) through the need to modify physical behaviors by use of social distancing, avoiding confined indoor spaces, and avoiding congregating in the same physical area as others, in order to reduce or minimize the potential for viral transmission; and, (4) through the need to mitigate the threat or actual physical presence of the Coronavirus on door handles, desks, chairs, computers, library shelving, in heating and air

---

[18] Randy Ludlow & Jackie Borchardt, *Ohio will end coronavirus health orders when cases dip, Gov. Mike DeWine says*, Cincinnati Enquirer (Mar. 4, 2021), https://www.cincinnati.com/story/news/politics/2021/03/04/coronavirus-ohio-one-year-later-more-vaccines-but-not-out-woods-yet/6867264002/ (last visited Mar. 9, 2021).

[19] *Ohio's COVID-19 positive test rate reaches lowest point since April based on 7-day average*, ABC 6 (Sep. 21, 2020), https://abc6onyourside.com/news/local/ohios-covid-19-positive-test-rate-reaches-lowest-point-since-april-based-on-7-day-average (last visited Mar. 1, 2021).

[20] *Ohio coronavirus map: What do the trends mean for you?*, Mayo Clinic (Feb. 27, 2021), https://www.mayoclinic.org/coronavirus-covid-19/map/ohio (last visited Mar. 1, 2021).

conditioning systems, and any of the multitude of other places the Coronavirus has or could be found.

35.     The presence of the Coronavirus in the air and on surfaces also has made the EIIA Members facilities uninhabitable, unsafe, and/or unfit for their intended uses – just as if asbestos, ammonia, fumes or a salmonella outbreak was in the air or on surfaces of the premises.  As a result, they had to operate at a limited capacity or close entirely.

36.     On March 10, 2020, Governor DeWine issued a press release asking Ohio colleges and universities "to screen students returning to school from international travel or cruises" and to "consider offering online/remote learning."[21]

37.     On March 22, 2020, Ohio issued a "Stay at Home Order" directing "non-essential business and operations" to "cease" as of March 23, 2020.[22]  The Stay at Home Order permitted colleges to remain open only "for the purposes of facilitating distance learning, performing critical research, or performing essential functions, provided that social distancing of six-feet per person is maintained to the greatest extent possible."[23]

38.     Pursuant to Governor DeWine's guidance, the Stay at Home Order, and the need to protect the health and safety of students, employees and the community and mitigate losses, the EIIA Members could not operate in accordance with their normal operations, directed students to leave campus if possible, and began remote learning.

39.     While the EIIA Members resumed in-person classes in the Fall 2020 semester, the interruption led to significant losses, including, but not limited to: food service, housing income, lost/returned tuition, reduced enrollment, increased expenses for campus safety and health services, costs associated with the modification of indoor and outdoor space for social distancing,

---

[21] *Governor DeWine Recommends Limiting Large Indoor Gatherings*, Mike DeWine, Governor (Mar. 10, 2020), https://governor.ohio.gov/wps/portal/gov/governor/media/news-and-media/recommends-limiting-large-indoor-gatherings (last visited Feb. 28, 2021).

[22] *Director's Stay At Home Order*, Ohio Department of Health (Mar. 22, 2020), https://content.govdelivery.com/attachments/OHOOD/2020/03/22/file_attachments/1407840/Stay%20Home%20Order.pdf (last visited Feb. 28, 2021).

[23] *Id.*

installation of physical barriers, dorm clean-up and maintenance costs, emergency student grants/financial aid and enhanced sanitizing and cleaning.  Even after reopening, the EIIA Members continue to operate with extensive and costly health and safety protocols and numerous modifications to their property.

40.    For example, approximately 37 students who were planning to attend Denison disenrolled, specifically citing COVID-19.

41.    With respect to Kenyon, campus enrollment declined by approximately 200 students, when comparing the budgeted on-campus enrollment with the actual enrollment figures.

42.    Despite complying with all required precautions, the EIIA Members have not escaped the spread of COVID-19.  Over 27 Denison, 26 Kenyon, 6 OWU, and 50 Wooster employees contracted COVID-19.

43.    Many students also tested positive for COVID-19, including: 52 Denison, 32 Kenyon, 162 OWU, and 152 Wooster students.  Given the high percentage of asymptomatic cases of COVID-19, and the timing and limits of the EIIA Members' testing programs, it is certain that the actual number of the EIIA Members' employees and students who have contracted COVID-19 were substantially greater than the number of employees and students currently known to have contracted COVID-19.

44.    To cushion the blow from the devastating impact of the Coronavirus and COVID-19, the EIIA Members turned to Defendant Insurers, to whom the EIIA Members paid substantial premiums.  Defendant Insurers, however, turned their back on the EIIA Members and shirked their obligations under the Policies, putting the EIIA Members and their vital educational mission at risk.

45.    More specifically, the EIIA Members submitted a claim for loss or damage to their property and business interruption related losses, and other covered losses arising from the Coronavirus and COVID-19, but Defendant Insurers have refused to provide coverage or even properly investigate the EIIA Members' losses.

10

46.     The EIIA Members seek damages for breach of contract against Defendant Insurers for their failure to honor their policy obligations.

47.     The EIIA Members also seek a judgment declaring the scope of Defendant Insurers' obligation to pay the EIIA Members' losses under the Policies.

**THE PARTIES**

48.     Wooster is a non-profit corporation formed under the laws of Ohio with its principal place of business in Wooster, Ohio.

49.     Denison is a non-profit corporation formed under the laws of Ohio with its principal place of business in Granville, Ohio.

50.     Kenyon is a non-profit corporation formed under the laws of Ohio with its principal place of business in Gambier, Ohio.

51.     OWU is a non-profit corporation formed under the laws of Ohio with its principal place of business in Delaware, Ohio.

52.     Upon information and belief, Beazley subscribing to Policy Number W2205F200301, are comprised of two syndicates of unknown citizenship who subscribed to the above-mentioned policy.

53.     Upon information and belief, GuideOne is a corporation formed under the laws of Iowa with its principal place of business in Iowa.

54.     Upon information and belief, Colony is a corporation formed under the laws of Virginia with its principal place of business in Texas.

55.     Upon information and belief, ACE is a corporation formed under the laws of Pennsylvania with its principal place of business in Pennsylvania.

56.     Upon information and belief, Starr is a corporation formed under the laws of Texas with its principal place of business in New York.

57.     Upon information and belief, Arch is a corporation formed under the laws of Missouri with its principal place of business in New Jersey.

58.     Upon information and belief, Evanston is a corporation formed under the laws of Illinois with its principal place of business in Illinois.

59.     Upon information and belief, Lloyd's subscribing to Policy Number B080110908U20, are comprised of various syndicates of unknown citizenship who subscribed to the above-mentioned policy.

60.     Upon information and belief, Ategrity is a corporation formed under the laws of Delaware with its principal place of business in Arizona.

61.     Upon information and belief, HDI is a corporation formed under the laws of Illinois with its principal place of business in Illinois.

62.     Upon information and belief, Westport is a corporation formed under the laws of Missouri with its principal place of business in Missouri.

63.     Upon information and belief, Tokio Marine is a corporation formed under the laws of New York with its principal place of business in New York.

64.     Upon information and belief, Endurance is a corporation formed under the laws of Delaware with its principal place of business in New York.

65.     Upon information and belief, Princeton is a corporation formed under the laws of Delaware with its principal place of business in New Jersey.

66.     Upon information and belief, Mitsui is a corporation formed under the laws of New York with its principal place of business in New Jersey.

67.     Upon information and belief, Homeland is a corporation formed under the laws of New York with its principal place of business in Minnesota.

## JURISDICTION AND VENUE

68.     This Court has general personal jurisdiction over Defendant Insurers pursuant to Fed. R. Civ. P. 4(k)(1)(a) and Ohio Revised Code §2307.382 because Defendant Insurers carry on a continuous and systematic part of their general business within Ohio, including but not limited

to marketing, selling, and issuing insurance policies to Ohio businesses and insuring property in Ohio.

69.     This Court also has specific personal jurisdiction over Defendant Insurers because Defendant Insurers contracted to insure property and/or risk located within Ohio at the time of contracting, and out of which this action arose.  Fed. R. Civ. P. 4(k)(1)(a), Ohio Revised Code §2307.382(9).

70.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because "a substantial part of the events of omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated" in this district.  Additionally, venue is property in this district because Defendant Insurers are corporations subject to this Court's personal jurisdiction, and thus deemed to reside in this district pursuant to 28 U.S.C. § 1391(c)(2).

## FACTUAL BACKGROUND

### A.     The EIIA Members

71.     Wooster is a private liberal arts college located in Wooster, Ohio founded in 1866. Wooster is widely known for its emphasis on mentored undergraduate research.  Each of its approximately 2,000 enrolled students works one-on-one with a faculty mentor to conceive, organize and complete a significant research project on a topic of the student's choosing. Approximately 15% of the student body is international in origin, representing 59 countries.

72.     Denison is a private liberal arts college located in Granville, Ohio.  Founded in 1831, Denison has approximately 2,300 undergraduate students and offers over 53 majors. Denison students hail from 40 U.S. states and 23 countries.  Denison boasts a 9-to-1 average student to faculty ratio and over 160 student organizations.  Denison has a fully residential campus, and students are heavily dependent on campus facilities.

73.     Kenyon is a private liberal arts college located in Gambier, Ohio founded in 1824. Approximately 1,830 students come from 48 U.S. states and 49 countries.  Kenyon offers more than 50 majors, 150 clubs and organizations, and more than 190 study abroad programs in 50

countries.  Prior to implementing remote learning, 100% of Kenyon students lived in its 30 residence halls or other campus housing.  Kenyon has a fully residential campus, and students are heavily dependent on campus facilities.

74.     OWU is a private liberal arts college located in Delaware, Ohio and was founded in 1842 as a nonsectarian institution.  Undergraduate admission is currently 1,426 students, with about 60% of the student population being Ohio residents, and 27% international students.  OWU has one of the highest percentages of international students among liberal arts colleges.  OWU combines the advantages of a small college, such as a 10-to-1 average student to faculty ratio, while offering over 70 majors.

75.     As a part of their prudent business practices and in recognition of their responsibilities to their employees, students and community, the EIIA Members maintain insurance coverage.

76.     The EIIA Members specifically maintain "all-risk" commercial property coverage with Defendant Insurers, covering not only more commonly occurring risks but also entirely unanticipated and novel risks that may arise.

**B.     The COVID-19 Pandemic**

77.     COVID-19 is a severe communicable disease caused by the Coronavirus.  COVID-19 is responsible for over 109 million reported cases and at least 2.4 million deaths worldwide.[24]  Unlike other members of the coronavirus family, which tend to cause mild-to-moderate upper respiratory tract illness, the Coronavirus causes serious systemic illness and death.[25]  COVID-19 has been declared a global pandemic by the World Health Organization ("WHO"),[26] and as such,

---

[24] Sergio Hernandez, Byron Manley, Henrik Pettersson, *Tracking coronavirus' global spread*, CNN Health (last updated Feb. 15, 2021), https://www.cnn.com/interactive/2020/health/coronavirus-maps-and-cases/ (last visited Feb. 15, 2021).

[25] Tianna Hicklin, *Immune cells for common cold may recognize SARS-COV-2*, NAT. INST. OF HEALTH (Aug. 18, 2020), https://www.nih.gov/news-events/nih-research-matters/immune-cells-common-cold-may-recognize-sars-cov-2 (last visited Feb. 17, 2021).

[26] WHO, *WHO Director-General's opening remarks at the media briefing on COVID-19* (Mar. 11, 2020), https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (last visited Feb. 12, 2021).

the disease and its causative virus, Coronavirus, are presumed to be present or imminently present everywhere.[27]

78.    The existence and/or presence of the Coronavirus and COVID-19 is not simply reflected in reported cases or individuals' positive test results.  The Centers for Disease Control and Prevention ("CDC") estimates that the number of people in the United States who have been infected with COVID-19 is likely to be 10 times higher than the number of reported cases.[28] Additionally, at least 40% of people infected with COVID-19 are asymptomatic.[29]  COVID-19 also includes a pre-symptomatic incubation period of up to 14 days, during which time infected people can transmit COVID-19 to people and onto surfaces without having experienced symptoms and without realizing that they are infected.[30]  Studies have demonstrated that pre-symptomatic individuals have an even greater ability to transmit COVID-19 than other infected people because they carry the greatest "viral load."[31]  The National Academy of Sciences has concluded that "the majority of transmission is attributable to people who are not exhibiting symptoms, either because they are still in the pre-symptomatic stage or the infection is asymptomatic."[32]

---

[27] *See, e.g.*, Christopher Ingraham, *At the population level, the coronavirus is almost literally everywhere,* WASH. POST, Apr. 1, 2020, https://www.washingtonpost.com/business/2020/04/01/population-level-coronavirus-is-almost-literally-everywhere/ (last visited Feb. 12, 2021).

[28] Lena H. Sun and Joel Achenbach, *CDC chief says coronavirus cases may be 10 times higher than reported,* WASH. POST (June 25, 2020), https://www.washingtonpost.com/health/2020/06/25/coronavirus-cases-10-times-larger/ (last visited Feb. 17, 2021).

[29] Ellen Cranley, *40% of people infected with covid-19 are asymptomatic, a new CDC estimate says,* BUS. INSIDER (July 12, 2020), https://www.businessinsider.com/cdc-estimate-40-percent-infected-with-covid-19-asymptomatic-2020-7 (last visited Feb. 17, 2021).

[30] *See* WHO, *Coronavirus disease 2019 (COVID-19) Situation Report - 73* (Apr. 2, 2020), https://apps.who.int/iris/bitstream/handle/10665/331686/nCoVsitrep02Apr2020-eng.pdf?sequence=1&isAllowed=y (last visited Feb. 17, 2021); Minghui Yang , Liang Li , Ting Huang, Shaxi Li, Mingxia Zhang, Yang, Yujin Jiang, Xiaohe Li, Jing Yuan, and Yingxia Liu, *SARS-CoV-2 Detected on Environmental Fomites for Both Asymptomatic and Symptomatic Patients with COVID-19*, 203 AM. J. OF RESPIRATORY AND CRITICAL CARE MED. 3, 374-78 (Feb. 1, 2021), https://doi.org/10.1164/rccm.202006-2136LE (last visited Feb. 18, 2021).

[31] *See, e.g.*, Xi He et al., *Temporal dynamics in viral shedding and transmissibility of COVID-19,* 26 NATURE MED. 672, 674 (Apr. 15, 2020), https://www.nature.com/articles/s41591-020-0869-5 (last visited Feb. 17, 2021); Lirong Zou, et al., *SARS-CoV-2 Viral Load in Upper Respiratory Specimens of Infected Patients,* NEW ENG. J. OF MED. (Mar. 19, 2020).

[32] Meagan C. Fitzpatrick, Alison P. Galvani, Seyed M. Moghadas, Abhishek Pandey, Pratha Sah, Affan Shoukat, and Burton H. Singer, *The implications of silent transmission for the control of COVID-19*

79.     As early as February 26, 2020, the CDC advised that COVID-19 was spreading freely without the ability to trace the origin of new infections, also known as community transmission.

80.     On March 11, 2020, the WHO declared COVID-19 to be a global pandemic.

81.     COVID-19 is highly contagious, uniquely resilient, and potentially deadly. The degree to which an infectious disease is contagious is measured by $R^0$, a term that defines how many other people will become infected by one person with that disease. Studies have concluded that one person with the Coronavirus will infect up to 5.7 others ($R^0 \approx 5.7$), much higher than seasonal influenza for example, where on average, one person will infect only 1.3 others ($R^0 \approx 1.3$).[33]

82.     The Coronavirus can remain infectious for "much longer time periods than generally considered possible."[34] In the Journal of Virology, researchers demonstrated that the Coronavirus can survive up to 28 days at room temperature ($68°$F) on a variety of surfaces including glass, steel, vinyl, plastic, and paper.[34] A CDC report from March 27, 2020, stated that the Coronavirus was identified on surfaces of the cabins on board the Diamond Princess cruise ship 17 days after the cabins were vacated but before they were disinfected.[35] Numerous other scientific studies and articles have identified the persistence of the Coronavirus on doorknobs, toilets, faucets and other high-touch points, as well as on commonly overlooked surfaces such as floors.[36]

---

[33] M. Cevik, C.C.G. Bamford, A. Ho, *COVID-19 pandemic-a focused review for clinicians*, 26 CLINICAL MICROBIOLOGY & INFECTION 7, 842-47 (July 2020), https://www.clinicalmicrobiologyandinfection.com/article/S1198-743X(20)30231-7/fulltext (last visited Feb. 17, 2021).

*outbreaks*, 117 PNAS 30, 17513-15, July 28, 2020 https://www.pnas.org/content/117/30/17513 (last visited Feb. 12, 2021).

[34] Shane Riddell, Sarah Goldie, Andrew Hill, Debbie Eagles & Trevor W. Drew, *The effect of temperature on persistence of SARS-CoV-2 on common surfaces*, 17 VIROLOGY J. 145 (2020), https://doi.org/10.1186/s12985-020-01418-7 (last visited Feb. 12, 2021).

[35] Leah F. Moriarty, Mateusz M. Plucinski, Barbara J. Marston, et al., *Public Health Responses to COVID-19 Outbreaks on Cruise Ships — Worldwide, February–March 2020*, 69 MMWR 12, 347-352, (Mar. 27, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm (last visited Feb. 12, 2021).

[36] Zhen-Dong Guo, Zhong-Yi Wang, Shou-Feng Zhang, Xiao Li, Lin Li, Chao Li, Yan Cui, Rui-Bin Fu, Yun-Zhu Dong, Xiang-Yang Chi, Meng-Yao Zhang, Kun Liu, Cheng Cao, Bin Liu, Ke Zhang, Yu-Wei

16

83.    The WHO states that "[t]he disease spreads primarily from person to person through small droplets from the nose or mouth, which are expelled when a person with COVID-19 coughs, sneezes, or speaks . . . .  People can catch COVID-19 if they breathe in these droplets from a person infected with the virus . . . .  These droplets can land on objects and surfaces around the person such as tables, doorknobs and handrails.  People can become infected by touching these objects or surfaces, then touching their eyes, nose or mouth."[37]

84.    Ohio experienced a reported COVID-19 outbreak in mid-March 2020, and experienced dramatic increases in the number of cases thereafter.[38]

**C.    The Coronavirus and COVID-19 Cause Loss or Damage to Property**

85.    The omnipresence of the Coronavirus and COVID-19 is enabled by multiple modes of viral transmission, including respiratory droplet, airborne, and fomite transmission (i.e., transmission from surfaces and objects).[39]  These transmission methods demonstrate that the Coronavirus and/or COVID-19 cause loss or damage to property.

86.    Respiratory transmission of COVID-19 occurs through exposure to an infected person's respiratory particles, such as from saliva or mucus.[40]  Respiratory transmission of the Coronavirus is commonly divided into droplet (larger particles that have a transmission range of about six feet) and airborne (smaller particles that can remain suspended in the air for prolonged periods of time) modes of transmission.  Though convenient, this binary division is an

---

Gao, Bing Lu, Wei Chen, *Aerosol and Surface Distribution of Severe Acute Respiratory Syndrome Coronavirus 2 in Hospital Wards, Wuhan, China, 2020,* 26 EMERG. INFECT. DIS. 7, 1583-91 (July 2020), https://pubmed.ncbi.nlm.nih.gov/32275497/ (last visited Feb. 17, 2021).

[37] *Q&A on coronaviruses (COVID-19)*, World Health Organization, https://web.archive.org/web/20200506094904/https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/q-a-coronaviruses (last visited Feb. 12, 2021).

[38] *Timeline:  Saturday is 1-year anniversary of Ohio's first coronavirus case*, NBC4i.com (Dec. 31, 2020), https://www.nbc4i.com/community/health/coronavirus/timeline-saturday-is-1-year-anniversary-of-ohios-first-coronavirus-case/ (last visited Mar. 1, 2020).

[39] *See, e.g.*, WHO, *Transmission of SARS-CoV-2: implications for infection prevention precautions* (Jul. 9, 2020), https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (last visited Feb. 12, 2021).

[40] *Id.*

oversimplification that underscores transmission risk.[41]  Humans produce a wide range of particle sizes when coughing, sneezing, talking, singing, or otherwise dispersing droplets, with pathogens predominating in the smallest particles.[42]  Respiratory particles produced by the average person can travel almost 20 feet by sneezing.[43]  An M.I.T. researcher has found that virus-laden "clouds" containing clusters of droplets can travel 23 to 27 feet.[44]

87.     Airborne transmission involves the spread of the infectious agent caused by the dissemination of droplet nuclei (aerosols) from, *e.g.*, exhaled breath, that remain infectious when suspended in the air over long distances and time.[45]  These tiny particles can remain suspended "for indefinite periods unless removed by air currents or dilution ventilation."[46]  As a result, the risk of disease transmission increases substantially in enclosed environments, compared to outdoor settings.[47]

88.     The WHO and the scientific community have studied the spread of the Coronavirus through aerosols in indoor settings via air circulation systems.  For example, the CDC published a research letter concluding that a restaurant's air conditioning system triggered transmission of the

---

[41] Kevin P. Fennelly, *Particle sizes of infectious aerosols: implications for infection control*, 8 LANCET RESPIRATORY MED. 9, P914-24 (Sept. 1, 2020), https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30323-4/fulltext (last visited Feb. 17, 2021).

[42] *Id.*

[43] *Id.*

[44] Lydia Bourouiba, *Turbulent Gas Clouds and Respiratory Pathogen Emissions, Potential Implications for Reducing Transmission of COVID-19*, 323 JAMA 18, 1837-38, Mar. 26, 2020, https://jamanetwork.com/journals/jama/fullarticle/2763852 (last visited Feb. 12, 2021).

[45] *Id.; see also* Jose-Luis Jimenez, *COVID-19 Is Transmitted Through Aerosols. We Have Enough Evidence, Now It Is Time to Act,* TIME, Aug. 25, 2020, https://time.com/5883081/covid-19-transmitted-aerosols/ (last visited Feb. 12, 2021); Ramon Padilla & Javier Zarracina, *Coronavirus might spread much farther than 6 feet in the air. CDC says wear a mask in public,* (last updated Sept. 21, 2020), www.usatoday.com/in-depth/news/2020/04/03/coronavirusprotection-how-masks-might-stop-spread-throughcoughs/5086553002/ (last visited Feb. 12, 2021); Nan Zhang, Jianjian Wei, Hui-Ling Yen, and Yuguo Li, *Short-range airborne route dominates exposure of respiratory infection during close contact,* 176 BLDG. AND ENV'T (June 2020).

[46] Kevin P. Fennelly, *Particle sizes of infectious aerosols: implications for infection control*, 8 LANCET RESPIRATORY MED. 9, P914-24 (Sept. 1, 2020), https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30323-4/fulltext (last visited Feb. 17, 2021).

[47] Muge Cevik, Julia L Marcus, Caroline Buckee, & Tara C Smith, *Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) Transmission Dynamics Should Inform Policy*, CLINICAL INFECTIOUS DISEASES (2020), https://academic.oup.com/cid/advance-article/doi/10. 1093/cid/ciaa1442/5910315 (last visited Feb. 17, 2021).

Coronavirus, spreading it to people who sat at separate tables downstream of the restaurant's airflow.[48]

89.     Additionally, the CDC has stated that "there is evidence that under certain conditions, people with COVID-19 seem to have infected others who were more than 6 feet away" and infected people who entered the space shortly after the person with COVID-19 had left.[49]  A recently published (February 2021) systematic review of airborne transmission of the Coronavirus corroborated the CDC's concerns and recommended procedures to improve ventilation of indoor air environments to decrease bioaerosol concentration and reduce the Coronavirus' spread.[50]

90.     The CDC has recommended "ventilation interventions" to help reduce exposures to the airborne Coronavirus in indoor spaces, including increasing airflow and air filtration (such as with high-efficiency particulate air (HEPA) fan/filtration systems).[51]   These and other remedial measures must be implemented, at high cost and extra expense, to reduce the amount of the Coronavirus present in the space and make property safe for its intended use.  These extreme measures demonstrate that the Coronavirus and COVID-19 cause loss or damage to interior spaces.

91.     COVID-19 may also be transmitted to people from physical objects, materials or surfaces.  "Fomites" are physical objects or materials that carry, and are capable of transmitting

---

[48] Jianyun Lu, Jieni Gu, Kuibiao Li, Conghui Xu, Wenzhe Su, Zhisheng Lai, Deqian Zhou, Chao Yu, Bin Xu, and Zhicong Yang, *COVID-19 outbreak associated with air conditioning in restaurant, Guangzhou, China, 2020,* 26 EMERGING INFECTIOUS DISEASES 7 (July 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-0764_article (last visited Feb. 12, 2021); *see also* Keun-Sang Kwon, Jung-Im Park, Young Joon Park, Don-Myung Jung, Ki-Wahn Ryu, and Ju-Hyung Lee, *Evidence of Long-Distance Droplet Transmission of SARS-CoV-2 by Direct Air Flow in a Restaurant in Korea*, 35 J. KOREAN MED. SCI. 46 (Nov. 2020), https://doi. org/10.3346/jkms.2020.35.e415 (last visited Feb. 12, 2021).

[49] CDC, *Ways COVID-19 Spreads* (last updated Oct. 28, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-*getting*-sick/how-covid-spreads.html (last visited Feb. 17, 2021).

[50] Zahra Noorimotlagh, Neemat Jaafarzadeh, Susana Silva Martínez, & Seyyed Abbas Mirzaee, *A systematic review of possible airborne transmission of the COVID-19 virus (SARS-CoV-2) in the indoor air environment*, 193 ENV'T RSCH. 110612, 1-6 (Feb. 2021), https://www.science direct.com/science/article/pii/S0013935120315097?dgcid=rss_sd_all (last visited Feb. 17, 2021).

[51] CDC, *Ventilation in Buildings* (last updated Feb. 9, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/ventilation.html#:~:text=HEPA%20filters%20are%20even%20 more,with%20SARS%2DCoV%2D2 (last visited Feb. 12, 2021).

infectious agents, altering these objects to become vectors of disease.[52] Fomite transmission has been demonstrated as highly efficient for viruses, both from object-to-hand and from hand-to-mouth.[53]

92.    The WHO has described fomite transmission as follows:

> Respiratory secretions or droplets expelled by infected individuals can contaminate surfaces and objects, creating fomites (contaminated surfaces). **Viable SARS-CoV-2 virus and/or RNA detected by RT-PCR can be found on those surfaces for periods ranging from hours to days**, depending on the ambient environment (including temperature and humidity) and the type of surface, in particular at high concentration in health care facilities where COVID-19 patients were being treated. Therefore, transmission may also occur indirectly through touching surfaces in the immediate environment or objects contaminated with virus from an infected person . . . .[54] (Emphasis added).

93.    In addition to studies cited by the WHO,[55] numerous other studies and scientific articles have discussed fomite transmission as a mode of virus transmission, including, but not limited to:

a.    A study of a COVID-19 outbreak published by the CDC identifying elevator buttons and restroom taps as possible causes of the "rapid spread of SARS-CoV-2" in a shopping mall in China.[56]

b.    A National Institutes of Health study published in the New England Journal of Medicine finding that the Coronavirus survives up to 4 hours on copper, up to 24 hours on cardboard, and up to 3 days on plastic and stainless steel,

---

[52] Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/fomite (last visited Feb. 12, 2021).

[53] P. Rusin, S. Maxwell, & C. Gerba, *Comparative surface-to-hand and fingertip-to-mouth transfer efficiency of gram-positive bacteria, gram-negative bacteria, and phage*, 93 J. OF APPLIED MICROBIOLOGY, 4, 585-92 (Sept. 18, 2002), https://pubmed.ncbi.nlm.nih.gov/12234341/ (last visited Feb. 18, 2021).

[54] *See, e.g.*, WHO, *Transmission of SARS-CoV-2: implications for infection prevention precautions* (Jul. 9, 2020), https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (last visited Feb. 12, 2021).

[55] *Id.*

[56] CDC, Jing Cai, Wenjie Sun, Jianping Huang, Michelle Gamber, Jing Wu, Guiqing He, *Indirect Virus Transmission in Cluster of COVID-19 Cases, Wenzhou, China, 2020*, 26 EMERGING INFECTIONS DISEASES 6 (June 2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article (last visited Feb. 12, 2021).

and suggesting that people may acquire the virus through the air and after touching contaminated objects.[57]

c.    An American Society for Microbiology article discussing fomite infection as involving both porous and non-porous surfaces, and occurring through a fomite's contact with bodily secretions, hands, aerosolized virus from talking, sneezing, coughing, etc., or other airborne viral particles that settle after a disturbance of a fomite (*e.g.*, shaking a contaminated blanket).[58] According to the researchers, "[o]nce a fomite is contaminated, the transfer of infectious virus may readily occur between inanimate and animate objects, or vice versa, and between two separate fomites (if brought together)."[59]  Of course, materials like desks, chairs, computer terminals and a huge variety of education-related equipment that come into contact with droplets and hands are handled thousands of times a day.  Generally, frequently touched surfaces can become highly transmissive fomites.[60]

d.    A CDC research letter reporting that the Coronavirus can remain viable on polystyrene plastic, aluminum, and glass for 96 hours in indoor living spaces.[61]

e.    A *Journal of Hospital Infection* article citing studies revealing that human coronaviruses can persist on inanimate surfaces like metal, glass, or plastic

---

[57] National Institutes of Health, *New coronavirus stable for hours on surfaces* (Mar. 17, 2020), https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces (last visited Feb. 12, 2021).

[58] Stephanie A. Bone and Charles P. Gerba, *Significance of Fomites in the Spread of Respiratory and Enteric Viral* Disease, 73 APPLIED AND ENVIRONMENTAL MICROBIOLOGY 6, 1687-96 (Mar. 2007), https://aem.asm.org/content/73/6/1687 (last visited Feb. 12, 2021).

[59] *Id.*

[60] *Id.*

[61] CDC, Boris Pastorino, Franck Touret, Magali Gilles, Xavier de Lamballerie, and Rémi N. Charrel, *Prolonged Infectivity of SARS-CoV-2 in Fomites*, 26 EMERGING INFECTIOUS DISEASES 9 (Sept. 2020), https://wwwnc.cdc.gov/eid/article/26/9/20-1788_article (last visited Feb. 12, 2021).

for up to 9 days.[62]

94.     Importantly, the Coronavirus has been detected on environmental objects and surfaces from both symptomatic and asymptomatic individuals.[63]  Fomites transform the surface of property into a potentially deadly Coronavirus transmission device.  A study published in the Journal of Epidemiology and Infection demonstrated that after lockdown in the United Kingdom, Coronavirus transmission via fomites may have contributed to as many as 25% of deaths in that region.[64]

95.     Accordingly, the presence of the Coronavirus in and on property, including in indoor air, on surfaces, and on objects, causes loss or damage to property by causing physical harm to and altering property and otherwise making it incapable of being used for its intended purpose.

96.     Among other things, the presence of the Coronavirus transforms everyday surfaces and objects into fomites, causing a tangible change of the property into a transmission vehicle for disease from one host to another.  The WHO's description of fomite transmission of COVID-19 expressly recognizes this physical alteration of property, describing viral droplets as "**creating** fomites (contaminated surfaces)"[65] (emphasis added).  "Creating" involves making or bringing

---

[62] G. Kampf, D. Todt, S. Pfaender, E. Steinmann, *Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents*, J. OF HOSPITAL INFECTION 104, 246-51 (2020), https://www.journalofhospitalinfection.com/action/showPdf?pii=S0195-6701%2820%2930046-3   (last visited Feb. 12, 2021).

[63] Minghui Yang, Liang Li, Ting Huang, Shaxi Li, Mingxia Zhang, Yang, Yujin Jiang, Xiaohe Li, Jing Yuan, and Yingxia Liu, *SARS-CoV-2 Detected on Environmental Fomites for Both Asymptomatic and Symptomatic Patients with COVID-19*, 203 AM. J. OF RESPIRATORY AND CRITICAL CARE MED. 3, 374-78 (Dec. 16, 2020), https://doi.org/10.1164/rccm.202006-2136LE (last visited Feb. 17, 2021).

[64] A. Meiksin, *Dynamics of COVID-19 transmission including indirect transmission mechanisms: A mathematical analysis*, 148 EPIDEMIOLOGY & INFECTION e257, 1-7 (2020), https:// www.cambridge.org/core/journals/epidemiology-and-infection/article/dynamics-of-covid19-transmission-including-indirect-transmission-mechanisms-a-mathematical-analysis/A134C518 2FD44BEC9E2BA6581EF805D3 (last visited Feb. 17, 2021).

[65] *See, e.g.*, WHO, *Transmission of SARS-CoV-2: implications for infection prevention precautions* (Jul. 9, 2020),   https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (last visited Feb. 12, 2021).

into existence something new[66] – such as something that is in an altered state from what it was before the Coronavirus was present on, in and around the property.

97.     The Coronavirus adheres to surfaces and objects, harming and physically changing and physically altering those objects by becoming a part of their surface and making physical contact with them unsafe for their ordinary and customary use.  Once the Coronavirus is in, on, or near property, it is easily spread by the air, people and objects from one area to another, causing additional loss or damage.

98.     Additionally, the presence of the Coronavirus in and on property, including in indoor air, on surfaces, and on objects, renders the property unsafe and unfit for its normal usage. Respiratory particles (including droplets and airborne aerosols) and fomites are physical substances that alter the physical properties of the interiors of buildings to make them unsafe, untenantable and uninhabitable.

99.     In addition to being found in air samples,[67] the Coronavirus remains stable in body secretions (respiratory, urine, feces), on surfaces, and in sewage, particularly at lower temperatures.[68]

100.     A number of studies have demonstrated that the Coronavirus is "much more resilient to cleaning than other respiratory viruses tested."[69]  The measures that must be taken to remove the Coronavirus from property are significant and far beyond ordinary cleaning.

101.     Efficacy of decontaminating agents for viruses are based on a number of factors, including the initial amount of virus present, contact time with the decontaminating agent, dilution,

---

[66] *See, e.g.,* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/create (last visited Feb. 12, 2021).

[67] Zhen-Dong Guo, Zhong-Yi Wang, Shou-Feng Zhang, Xiao Li, Lin Li, Chao Li, Yan Cui, Rui-Bin Fu, Yun-Zhu Dong, Xiang-Yang Chi, Meng-Yao Zhang, Kun Liu, Cheng Cao, Bin Liu, Ke Zhang, Yu-Wei Gao, Bing Lu, Wei Chen, *Aerosol and Surface Distribution of Severe Acute Respiratory Syndrome Coronavirus 2 in Hospital Wards, Wuhan, China, 2020,* 26 EMERG. INFECT. DIS. 7, 1583-91 (July 2020), https://pubmed.ncbi.nlm.nih.gov/32275497/ (last visited Feb. 17, 2021).

[68] Nevio Cimolai, *Environmental and decontamination issues for human coronaviruses and their potential surrogates,* 92 J. OF MED. VIROLOGY 11, 2498-510 (June 2020), https://doi.org/10.1002/jmv.26170 (last visited Feb. 17, 2021).

[69] *Id.*

temperature, and pH, among many others. Detergent surfactants are not recommended as single agents, but rather in conjunction with complex disinfectant solutions.[70]

102.    Additionally, it can be challenging to accurately determine the efficacy of decontaminating agents.   The toxicity of an agent may inhibit the growth of cells used to determine the presence of virus, making it difficult to determine if lower levels of infectious virus are actually still present on treated surfaces.[71]

103.    In order to be effective, cleaning and decontamination procedures require strict adherence to protocols not necessarily tested under "real life" or practical conditions, where treated surfaces or objects may not undergo even exposure or adequate contact time.[72]   Studies of coronaviruses have demonstrated viral RNA persistence on objects despite cleaning with 70% alcohol.[73]

104.    When considering disinfection and decontamination, the safety of products and procedures must be considered as well, due to the risks of harmful chemical accumulation, breakdown of treated materials, flammability, and potential for allergen exposure.[74]

105.    With respect to textiles, studies have demonstrated that the virus can survive on fabrics and be transferred to skin and other surfaces, "suggesting it is biologically plausible that . . . infectious diseases can be transmitted directly through contact with contaminated textiles."[75]

---

[70] *Id.*

[71] Muge Cevik, Julia L Marcus, Caroline Buckee, & Tara C Smith, *Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) Transmission Dynamics Should Inform Policy*, CLINICAL INFECTIOUS DISEASES (2020), https://academic.oup.com/cid/advance-article/doi/10. 1093/cid/ciaa1442/5910315 (last visited Feb. 17, 2021).

[72] *Id.*

[73] Joon Young Song, Hee Jin Cheong, Min Joo Choi, Ji Ho Jeon, Seong Hee Kang, Eun Ju Jeong, Jin Gu Yoon, Saem Na Lee, Sung Ran Kim, Ji Yun Noh, & Woo Joo Kim, *Viral Shedding and Environmental Cleaning in Middle East Respiratory Syndrome Coronavirus Infection*, 47 INFECTION & CHEMOTHERAPY 4, 252-5 (2015), https://www.icjournal.org/DOIx.php?id=10. 3947/ic.2015.47.4.252 (last visited Feb. 18, 2021).

[74] *Id.*

[75] Lucy Owen and Katie Laird, *The role of textiles as fomites in the healthcare environment: a review of the infection control risk*, 8 PEER J. LIFE AND ENV'T e9790, 1-35 (2020), https:// peerj.com/articles/9790/ (last visited Feb. 17, 2021).

Given the inadequacy of conventional cleaning procedures, disinfection and decontamination measures include, but are not limited to, the use of harsh chemicals to perform deep disinfection, the removal and disposal of porous materials like clothing, cloth and other fabrics, making changes to air filtration systems, and redesigning interior spaces, all performed at great cost and expense to the EIIA Members. These measures, among others, demonstrate that the Coronavirus and COVID-19 cause loss or damage to property.

106. Many of the surfaces and materials discussed in the studies and articles cited above are used at the EIIA Members' institutions, and as part of their operations, including plastics, glass, metals and cloth and fabrics such as blankets.

107. Over 27 Denison, 26 Kenyon, 6 OWU, and 50 Wooster employees have contracted COVID-19. Many students also tested positive for COVID-19, including: 52 Denison, 32 Kenyon, 162 OWU, and 152 Wooster students. Given the high percentage of asymptomatic cases of COVID-19, and the timing and limits of the EIIA Members' testing programs, it is certain that the actual number of the EIIA Members' employees and students who have contracted COVID-19 were substantially greater than the number of employees and students currently known to have contracted COVID-19.

108. The above is direct proof of the actual, certain presence of the Coronavirus on the EIIA Members' property.

109. Additionally, given how highly contagious the Coronavirus is, its multiple modes of transmission, the global pervasive status of COVID-19, it is statistically certain or near-certain that many other individuals at or in the vicinity of the EIIA Members' institutions contracted and/or carried the Coronavirus. It is also statistically certain or near-certain that the Coronavirus was dispersed continuously into the air and on property in and around such properties.

110. The presence of the Coronavirus and COVID-19 in, on, and near property therefore caused and continues to cause loss or damage to the EIIA Members' property, resulting in business income loss covered under the Policies.

111.    This loss or damage to the EIIA Members' property required EIIA Members to close their properties in whole or in part, cease in-person learning, incur extra expenses, and undertake costly efforts to protect and preserve property from further damage or loss. Even after resuming in-person learning, the many remaining restrictions continued to limit the EIIA Members' operations and require extensive ongoing remediation and decontamination procedures, all resulting in losses exceeding millions in damages.

**D.    The Certain or Virtually Certain Presence of the Coronavirus at the EIIA Members' Institutions**

112.    Before mid-March 2020, the EIIA Members were operating normally in all material respects, educating students in much the same ways as they did in 2019, and to some extent, much as they have done for hundreds of years. Ohio, like much of the nation, experienced dramatic COVID-19 outbreaks in mid- and late-March 2020.[76]

113.    The presence of the Coronavirus at the EIIA Members' institutions was certain or virtually certain. This can be confirmed with certainty or near-certainty by statistical modeling based on the known incidences of infection despite the lack of commercially available tests for fomite or the aerosolized Coronavirus, and despite the shortage of COVID-19 tests that could have otherwise been administered to every individual who was on-site at the relevant times.[77]

114.    Moreover, as discussed above, over 27 Denison, 26 Kenyon, 6 OWU and 50 Wooster employees were diagnosed with COVID-19. Still further, 52 Denison, 32 Kenyon, 162 OWU, and 152 Wooster students were diagnosed with COVID-19.

---

[76] *Timeline: Saturday is 1-year anniversary of Ohio's first coronavirus case*, NBC4i.com (Dec. 31, 2020), https://www.nbc4i.com/community/health/coronavirus/timeline-saturday-is-1-year-anniversary-of-ohios-first-coronavirus-case/ (last visited Mar. 1, 2020).

[77] *See, e.g.*, Aroon Chande, Seolha Lee, Mallory Harris, Quan Nguyen, Stephen J. Beckett, Troy Hilley, Clio Andris, & Joshua S. Weitz, *Real-time, interactive website for US-county-level COVID-19 event risk assessment*, 4 NAT. HUMAN BEHAVIOR, 1313-19 (Nov. 9, 2020), https://doi.org/10.1038/s41562-020-01000-9 (last visited Feb. 12, 2021).

115.    Early in the pandemic, testing was limited, and thus potentially thousands more people were infected than was reported.[78]  Concerning the testing that was available at that time, local positivity rates clearly demonstrated the pervasiveness of the Coronavirus throughout Ohio and in the counties where the EIIA Members are located.

116.    Epidemiologists have explained that "the percent positive is a critical measure because it gives us an indication of how widespread infection is in the area where the testing is occurring[.]"[79]  This is a crucial indicator of whether a business can safely remain open.  As a threshold for the percent positive being "too high," the WHO stated that the percent positive should remain below 5% for at least two weeks before reopening.[80]

117.    In April 2020, Ohio's positivity rate, the percentage of tests for COVID-19 that are positive, reached a high of 36%, many times the 5% threshold.[81]  In 2021, Ohio's positivity rate has remained relatively steady at over 9%, demonstrating the need for continuing health and safety measures.[82]

118.    As detailed below, throughout March 2020, Ohio Governor Mike DeWine and the Ohio Department of Health issued multiple orders restricting and subsequently closing most Ohio businesses, including most aspects of the EIIA Members' operations, through early May 2020. Additional orders enacted and maintained substantial restrictions on the EIIA Members' operations that persist through the present.

---

[78] *See, e.g.*, Benedict Carey and James Glanz, *Hidden Outbreaks Spread Through U.S. Cities Far Earlier Than Americans Knew, Estimates Say*, N.Y. TIMES (Apr. 23, 2020), (updated July 6, 2020), nytimes.com/2020/04/23/us/coronavirus-early-outbreaks-cities.html (last visited Feb. 12, 2021).

[79] David Dowdy and Gypsyamber D'Souza, *COVID-19 Testing: Understanding the "Percent Positive"*, Johns Hopkins Bloomberg School of Public Health Expert Insights (Aug. 10, 2020), https://www.jhsph.edu/covid-19/articles/covid-19-testing-understanding-the-percent-positive. html (last visited Feb. 12, 2021).

[80] *Id.*

[81] *Ohio's COVID-19 positive test rate reaches lowest point since April based on 7-day average*, ABC 6 (Sep. 21, 2020), https://abc6onyourside.com/news/local/ohios-covid-19-positive-test-rate-reaches-lowest-point-since-april-based-on-7-day-average (last visited Mar. 1, 2021).

[82] *Ohio coronavirus map: What do the trends mean for you?*, Mayo Clinic (Feb. 27, 2021), https:// www.mayoclinic.org/coronavirus-covid-19/map/ohio (last visited Mar. 1, 2021).

119.    These closures and restrictions were due to loss or damage to property caused by the Coronavirus and COVID-19, and as a result of the loss of the ability to operate the EIIA Members' institutions safely or without draconian restrictions and modifications to property and procedures.  Also, during this time, Governor DeWine and the Ohio Department of Health issued numerous emergency orders addressing the health and public safety crisis caused by the outbreak and requiring the use of decontamination and other health and safety protocols in an effort to limit exposure to and transmission of the Coronavirus.

120.    The governor and the Department of Health's emergency orders were issued for a number of reasons.  These include loss or damage to property caused by the Coronavirus and COVID-19; the ability of the Coronavirus and COVID-19 to be transmitted through fomites; and the ability of the Coronavirus and COVID-19 to survive on surfaces for days, linger in indoor air, and transform surfaces and air into vehicles of virus transmission, thereby rendering property unsafe for normal use.

**E.      Government Orders And The Impact On The EIIA Members' Operations**

121.    On March 16, 2020, the CDC and the national Coronavirus Task Force issued public guidance titled "30 Days to Slow the Spread" of COVID-19, which called for restrictive social distancing measures, such as working from home, avoiding gatherings of more than ten people and staying away from bars and restaurants.[83]

122.    State and local governments recognized the unprecedented and mushrooming outbreaks of COVID-19 across the nation and the Coronavirus' catastrophic impact through the loss or damage to property and lives.  As a consequence, many states issued "State of Emergency" Declarations in early March 2020.

123.    As detailed below, within a short time, the State of Ohio followed suit and issued orders suspending or severely limiting business operations where people could potentially contract

---

[83] The President's Coronavirus Guidelines for America, *30 Days to Slow the Spread*, The White House and CDC (Mar. 16, 2020), https://*trumpwhitehouse*.archives.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf (last visited Feb. 17, 2021).

COVID-19. College and universities, such as the EIIA Members, were barred from conducting in-person classes, and, when permitted to resume in-person classes, were subject to numerous restrictions and extensive disinfection and safety protocols.

124.    On March 10, 2020, Governor DeWine issued a press release asking Ohio colleges and universities in Ohio "to screen students returning to school from international travel or cruises" and to "consider offering online/remote learning."[84]

125.    To comply with the Governor's request, to keep students, faculty, staff and the community safe and healthy, and also to mitigate loss or damage to their property, the EIIA Members promptly announced plans to discontinue in-person classes and close their dorms, allowing only students with special circumstances to remain on campus (*e.g.*, students unable to return home). The EIIA Members continued support services for these students, but closed most campus facilities and cancelled or restricted events, athletics and gatherings.

126.    On March 12, 2020 the Ohio Department of Health issued an order prohibiting "mass gatherings" in Ohio, defined as any event "that brings together one hundred (100) or more persons in a single room or single space at the same time, such as an auditorium, stadium, arena, large conference room, meeting hall, theater, or any other confined indoor or outdoor space."[85] Subsequent orders limited the permissible size of gatherings to 50, and then later ten people.[86] As

---

[84] *Governor DeWine Recommends Limiting Large Indoor Gatherings*, Mike DeWine, Governor (Mar 10, 2020), https://governor.ohio.gov/wps/portal/gov/governor/media/news-and-media/recommends-limiting-large-indoor-gatherings (last visited Feb. 28, 2021).

[85] *In Re: Order to Limit and/or Prohibit Mass Gatherings in the State of Ohio*, Ohio Department of Health (Mar. 12, 2020), https://coronavirus.ohio.gov/wps/wcm/connect/gov/b815ab52-a571-4e65-9077-32468779671a/ODH+Order+to+Limit+and+Prohibit+Mass+Gatherings%2C+3.12.20.pdf?MOD=AJPERES&CONVERT_TO=url&CACHEID=ROOTWORKSPACE.Z18_M1HGGIK0N0JO00QO9DDDDM3000-b815ab52-a571-4e65-9077-32468779671a-n5828iN (last visited Mar. 1, 2021).

[86] *See, e.g., In Re: Amended Order to Limit and/or Prohibit Mass Gatherings in the State of Ohio*, Ohio Department of Health (Mar. 17, 2020), https://coronavirus.ohio.gov/wps/wcm/connect/gov/dd504af3-ae2c-4d2e-b2bd-02c1a3beed89/Director%27s+Order-+Amended+Mass+Gathering+3.17.20+%281%29.pdf?MOD=AJPERES&CONVERT_TO=url&CACHEID=ROOTWORKSPACE.Z18_M1HGGIK0N0JO00QO9DDDDM3000-dd504af3-ae2c-4d2e-b2bd-02c1a3beed89-n5829IL (last visited Mar. 1, 2020); *Director's Stay At Home Order*, Ohio Department of Health (Mar. 22, 2020), https://content.govdelivery.com/attachments/OHOOD/2020/03/22/file_attachments/1407840/Stay%20Home%20Order.pdf (last visited Feb. 28, 2021).

a result, the EIIA Members were required to cancel various performances, sporting events, event contracts and summer camps throughout the spring and summer of 2020.

127.    On March 15, 2020, the Ohio Department of Health issued an order limiting the sale of food and beverages to carry-out and delivery only, requiring the EIIA Members to change the way their food services and/or food service contractors operated, leading the EIIA Members to incur additional costs.[87]  This order also limited the operations at Denison's Granville Inn and Keyon's The Kenyon Inn and Restaurant to carry-out and delivery services, leading to additional costs and losses.

128.    On March 22, 2020, the Ohio Department of Health issued its "Stay at Home Order" directing "non-essential business and operations" to "cease" operations as of March 23, 2020.[88]  Governor DeWine introduced the Stay at Home Order by noting that:

> We haven't faced an enemy like we are facing today in 102 years – we are at war. In the time of war, we must make sacrifices, and I thank all of our Ohio citizens for what they are doing and what they aren't doing.  You are making a huge difference, and this difference will save lives.  Right now, we are in a crucial time in this battle.[89]

129.    The Stay at Home Order permitted colleges to remain open only "for the purposes of facilitating distance learning, performing critical research, or performing essential functions,

---

[87] *In re: Order Limiting the Sale of Food and Beverages, Liquor, Beer and Wine to Carry-out and Delivery Only*, Ohio Department of Health (Mar. 15, 2020), https://coronavirus.ohio.gov/wps/wcm/connect/gov/aa5aa123-c6c9-4e95-8a0d-bc77409c7296/Health+Director+Order+Limit+Food%2C+Alcohol+Sales+to+Carry+Out+Delivery+Only.pdf?MOD=AJPERES&CONVERT_TO=url&CACHEID=ROOTWORKSPACE.Z18_M1HGGIK0N0JO00QO9DDDDM3000-aa5aa123-c6c9-4e95-8a0d-bc77409c7296-n58291W (last visited Mar. 1, 2021).

[88] *Director's Stay At Home Order*, Ohio Department of Health (Mar. 22, 2020), https://content.govdelivery.com/attachments/OHOOD/2020/03/22/file_attachments/1407840/Stay%20Home%20Order.pdf (last visited Feb. 28, 2021).

[89] *Ohio Issues "Stay at Home" Order*, Mike DeWine, Governor of Ohio (Mar. 22, 2020), https://governor.ohio.gov/wps/portal/gov/governor/media/news-and-media/ohio-issues-stay-at-home-order-and-new-restrictions-placed-on-day-cares-for-children (last visited Feb. 28, 2020).

provided that social distancing of six-feet per person is maintained to the greatest extent possible."[90]

130. The Stay at Home Order required essential businesses, including colleges and universities, to, among other things, comply with social distancing requirements, mark off six-foot distances, have hand sanitizer and other sanitizing products readily available to employees and customers and set forth other specific requirements, including that institutions:

> Frequently perform enhanced environmental cleaning of commonly touched surfaces, such as workstations, countertops, railings, door handles and doorknobs. Use the cleaning agents that are usually used in these areas and follow directions on the label. Provide disposable wipes that commonly used surfaces can be wiped down by employees before each use.[91]

131. Denison and Kenyon are fully residential schools – so when orders were issued shutting down food services establishments for example, it was clear the universities had to send students home, because there was no off-campus living.

132. As a "non-essential" business, the Denison Golf Club was required to close by the Stay At Home Order.

133. As a result of the continuing spread of the Coronavirus and COVID-19 and the Stay At Home Order, the EIIA Members extended the cancellation of in-person classes as well as the closing of their dorms and other campus facilities through the Spring 2020 semester. As a result, the EIIA Members incurred a number of costs and losses including, but not limited to, losses associated with: cancelling numerous events and programs, cancelling or renegotiating vendor contracts, cancelling summer programs, refunding a portion of student room and board and certain other fees, the purchase of equipment, software and training costs associated with remote learning, and storage costs associated with student belongings that remained in the dormitories.

---

[90] *Director's Stay At Home Order*, Ohio Department of Health (Mar. 22, 2020), https://content. govdelivery.com/attachments/OHOOD/2020/03/22/file_attachments/1407840/Stay%20Home%20Order.pdf (last visited Feb. 28, 2021).

[91] *Id.*

134.     Pursuant to the Ohio Stay at Home Order, not all on-campus work was "essential," or necessary to "facilitate distancing learning" and the EIIA Members adjusted employee work accordingly.  In light of the need to retain employees and/or employee contracts, the EIIA Members continued to pay many employees unable to work remotely in whole or in part.  To the extent employees were let go, the EIIA Members incurred additional hiring, training and other costs as their campuses later partially reopened.

135.     The EIIA Members provided emergency financial assistance to their students whose lives were disrupted by the Coronavirus pandemic.  Grants were issued for, among other things, travel costs, computers needed for remote learning, and basic necessities.  Similarly, the EIIA Members incurred costs providing financial support to student workers to ease the financial pressures that many students were facing amid the global public health crisis.

136.     The restrictions of the Stay At Home Order, including those on colleges and universities, were extended through May 1, 2020.[92]

137.     On April 30, 2020 the Ohio Department of Health issued its "Stay Safe Ohio Order" which allowed certain business, including colleges and universities, to begin reopening as of May 4, 2020 (or on specified dates for certain business types) subject to compliance with the social distancing and other requirements specified in the Stay at Home Order and repeated in the Stay Safe Ohio Order.  The Stay Safe Ohio Order also required businesses to "[c]omply with all applicable guidance from the U.S. Centers for Disease Control and Prevention" and the Ohio Department of Health regarding social distancing, and added specific requirements for "general office environments."  Specifically, this order required businesses with office environments to:

     a.     Ensure minimum 6 feet between employees, and if not possible, install barriers;

     b.     Personnel should work from home when possible;

---

[92] Amended Director's Stay At Home Order, Ohio Department of Health (April 2, 2020), https://coronavirus.ohio.gov/static/publicorders/Directors-Stay-At-Home-Order-Amended-04-02-20.pdf (last visited Feb. 28, 2021).

      c.      Employees must perform daily symptom assessment that should include taking temperature with a thermometer, monitoring for fever, and watching for coughing or trouble breathing;

      d.      Require employees to stay home if symptomatic;

      e.      Consider having customers wear face coverings at all times;

      f.      Require regular handwashing by employees;

      g.      Reduce sharing of work materials;

      h.      Limit travel as much as possible;

      i.      Stagger arrival of all employees and guests;

      j.      Post signage on health and safety guidelines in common areas;

      k.      Frequent disinfection of desks, workstations and high contact surfaces;

      l.      Daily disinfection in common areas;

      m.      Cancel/postpone in person events when social distancing guidelines cannot be met;

      n.      No buffet in cafeteria;

      o.      Utilize disposable tableware and other materials;

      p.      Establish maximum capacity;

      q.      Immediately isolate and seek medical care for any individual who develops symptoms while at work;

      r.      Contact the local health district about suspected cases or exposures; and

      s.      Shutdown shop/floor for deep sanitation if possible.[93]

138.    The Stay Safe Ohio Order also continued to prohibit gatherings of over ten people except for weddings, religious gatherings or First Amendment-related activities.

139.    The Stay Safe Ohio Order did not allow campus food services, or restaurants such as the Granville Inn and The Kenyon Inn and Restaurant, to resume indoor dining. Similarly,

---

[93] *Director's Stay Safe Ohio Order*, Ohio Department of Health (April 30, 2020), https://coronavirus.ohio.gov/static/publicorders/Directors-Stay-Safe-Ohio-Order.pdf (last visited Mar. 7, 2021).

outdoor entertainment venues such as the Denison Golf Club, were also not permitted to resume operations.

140.    The Ohio Department of Health supplemented the reopening standards by order on May 29, 2020, which contained over six pages of detailed guidance regarding social distancing, sanitization, PPE, temperature check, signage, establishing maximum occupancy limits, use of barriers and other health and safety measures.[94]

141.    On July 8, 2020, Governor DeWine and the Ohio Department of Health published "Responsible Restart Ohio," which contained reopening guidance for "institutions of higher education," which expressly stated that "the health and safety of students, faculty, staff and campus visitors" was the "number one priority."[95]

142.    Responsible Restart Ohio set forth both "minimum operating standard[s]" and "recommended best practices" for colleges and universities relating to 16 different categories, including:  phased of reopening, facilities/sanitation, designating a point of contact, health monitoring/facial coverings/PPE requirements, residence halls, course scheduling/academic programming, classrooms, dining facilities, retail operations, general office environments, student activities and general campus events, campus visitors, testing, study abroad and international travel, gyms/recreational facilities and athletics.  Responsible Restart Ohio specifically cross referenced and incorporated the CDC's guidance for colleges and universities.[96]

143.    As the EIIA Members began the process of reopening after the Stay Safe Ohio Order, they made numerous changes to their normal operations including, but not limited to: managing campus density by having some staff and faculty work remotely; requiring daily

---

[94] *Re:  Director's Updated and Revised Order for Business Guidance and Social Distancing*, Ohio Department of Health (May 29, 2020),  https://coronavirus.ohio.gov/static/publicorders/revised-business-guidance-sd.pdf (last visited Mar. 2, 2021).

[95] *Responsible RestartOhio*, Governor Mike DeWine and Ohio Department of Health (July 8, 2020), https://web.archive.org/web/20200710123838/https://coronavirus.ohio.gov/static/responsible/Higher-Education.pdf (last visited Mar. 9, 2021).

[96] *Colleges & Universities Plan, Prepare, and Respond*, CDC (Updated Dec. 29, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/colleges-universities/index.html  (last visited Mar. 1, 2021).

personal symptom monitoring for students and staff; social distancing measures, including using larger and/or outdoor spaces for classes, purchasing equipment for outdoor spaces such as tents and outdoor furniture, modifying indoor spaces and installing barriers; altering class and other schedules to permit enhanced social distancing; additional labor arising from social distancing (for example, for activities conducted in more sessions with fewer students); distributing face masks; providing rapid and ample testing for COVID-19; conducting extensive contact tracing; quarantine support for those with symptoms or identified by contact tracing (for example, Denison modified and set aside two residence halls exclusively for quarantining students); and, strict disinfection and cleaning protocols in all public spaces on campus enabled by costly purchases of sanitation products (such as equipment for electrostatic cleaning) and the assignment of significant staff resources and/or vendor costs.[97]

144.    By way of further example, OWU senior leadership determined not to move ahead with an already planned and communicated increase to tuition for the 2020-2021 academic year. Additionally, for the Fall 2020 semester, OWU students could continue in the remote setting, which further created a loss of room and board revenue, that continued into the Spring 2021 semester.

145.    In November of 2020, COVID-19 surged in Ohio, with the daily number of new cases tripling.[98] As a result, the EIIA Members were forced to adopt a new round of health and safety precautions and limitations on their operations including a renewed halt on, or further modification of, in-person classes.

146.    Before and after resuming in-person classes, the EIIA Members are required to operate under severe restrictions and have undertaken expensive safety measures and related extra

---

[97] *See, e.g., Safe Campus Guide (COVID-19)*, Ohio Wesleyan University (Aug. 31, 2020), https://web.archive.org/web/20200831231426/https://www.owu.edu/about/safe-campus-guide-covid-19/ (last visited Mar. 2, 2021); *Faculty & Staff: Safe Work Guidelines*, Ohio Wesleyan University (Aug. 19, 2020), https://web.archive.org/web/20200819002009/https://www.owu.edu/about/safe-campus-guide-covid-19/faculty-staff-safe-work-guidelines/ (last visited Mar. 2, 2021).

[98] *Ohio Gov Announces Three-Week 10 p.m. Curfew After COVID Case Number Triples*¸ Newsweek (Nov. 17, 2020), https://www.newsweek.com/ohio-gov-announces-three-week-10-pm-curfew-after-covid-case-number-triples-1548217 (last visited Mar. 5, 2021).

expenses to prevent further loss or damage to their property from the Coronavirus.  Among other things, the EIIA Members have modified ventilation systems, reconfigured classrooms to allow social distancing, purchased equipment to utilize outdoor spaces, incurred equipment and software costs for remote learning, installed physical barriers, restricted class sizes and modified classrooms and other gathering spaces, issued refunds for cancelled events, pro-rated room and board, adopted rigorous procedures for disinfecting surfaces, added hand hygiene stations, incurred staffing and vendor expenses for extra disinfection, extensively tested students, faculty and staff, and provided workers with facemasks at massive cost.[99]

147.    As a result of the fundamental alteration of the learning and campus experience, many students chose not to continue their education with the EIIA Members leading to a reduction in enrollment and significant losses.

148.    The EIIA Members' losses exceed millions in damages, staggering sums for not-for-profit educational organizations devoted to educating the next generation.

149.    The EIIA Members timely notified Defendant Insurers of their losses and have met all conditions and requirements for coverage under the Policies.  As set forth herein, Defendant Insurers have wrongly refused to provide coverage.

**F.    The "All Risk" Commercial Property Policy and Potentially Applicable Coverages**

150.    The EIIA Members purchased a quota share program, to which Defendant Insurers subscribed – a type of sharing agreement where various insurers share a portion of the risk according to a fixed percentage.

151.    Each of the Defendant Insurers issued separate policies with unique market reference and/or policy numbers, setting forth their respective quota shares and adopting the terms of the main Policy.

---

[99] *See, e.g., COVID-19 Safe Campus Guide, Spring 2021*, Ohio Wesleyan University, https://www.owu.edu/about/safe-campus-guide-covid-19/ (last visited Feb. 28, 2021); *Guide To Spring 2021*, Denison, https://reopen.denison.edu/hc/en-us (last visited Feb. 28, 2021).

152.    In exchange for a very substantial premium, Defendant Insurers sold the EIIA Members the Policy, effective from March 1, 2020 to March 1, 2021.

153.    Defendant Insurers drafted the Policy.

154.    The EIIA Members did not draft the Policy.

155.    The Policy has a $1.2 billion per occurrence limit.

156.    The Policy has a deductible of "$750,000 in excess of the deductibles shown in Appendix A, subject to a maximum of $6,500,000 annually."  The Appendix A deductible for is $25,000 for Denison, OWU and Wooster, and $50,000 for Kenyon.  The Deductible applies to "[a]ll losses, damages or expenses arising out of any occurrence . . . ."

157.    The Policy does not exclude virus or communicable disease as causes of loss.  Thus, the entire $1.2 billion per occurrence limit is available for the EIIA Members' losses.

158.    The Policy's full terms and conditions are not set forth therein, but as relevant here, no policy exclusions apply to the EIIA Members' claim, and the Policy provides as follows:

### *Business Interruption Coverages*

159.    The Policy covers Business Interruption losses "resulting from necessary interruption of business conducted by the Insured, whether total or partial, and caused by loss, damage, or destruction covered herein . . . (the "Business Interruption Coverage")."

160.    As set forth herein, the Coronavirus and COVID-19 caused loss, damage or destruction to property to the EIIA Members' insured locations.

161.    The Coronavirus and COVID-19 also rendered such property unfit and unsafe for its normal usages, depriving the EIIA Members of their property.

162.    Neither the Coronavirus nor COVID-19, or losses therefrom, are excluded under the Policy.

163.    As a result of the presence of the Coronavirus and COVID-19 on premises, the EIIA Members have been subject to both total and partial closures beginning in mid-March 2020, and to the extent they have re-opened, they have done so subject to numerous restrictions on

normal business operations. As such, the EIIA Members have sustained and are sustaining substantial and covered business interruption losses.

164.    The Policy also includes an Extended Period of Liability, extending the Business Interruption Coverage "for such additional length of time as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no loss occurred[.]"

165.    The Policy provides Extra Expense Coverage, covering "the excess of the total cost chargeable to the operation of the Insured's business over and above the total cost that would normally have been incurred to conduct the business had no loss or damage occurred."

166.    As set forth herein, the EIIA Members incurred covered extra expenses to resume and continue as nearly as practicable to their normal business activities that were otherwise suspended due to loss, damage or destruction caused by the Coronavirus and COVID-19, costs associated with altering their property to protect it from further loss, damage or destruction, as well as to protect the safety of its students and employees, erecting barriers, altering air circulation, reconfiguring indoor spaces, disinfecting surfaces and materials, and providing PPE.

167.    The Policy also provides coverage for Rental Value and Royalties.

### ***Coverage Extensions***

168.    The Policy provides Interruption by Communicable Disease Coverage which states: "The Company will pay for the actual Gross Earnings loss sustained by the Insured, as provided by this Policy, resulting from the necessary interruption of the Insured's business activities at an Insured Location if the interruption is caused by order of an authorized governmental agency enforcing any law or ordinance regulating communicable diseases or by recommendation of the Center for Disease Control (CDC) or that such portions of the location are declared uninhabitable due to the threat of the spread of communicable disease, prohibiting access to those portions of the Location."

169.    The EIIA Members' access to their properties was interrupted and reduced by

orders and recommendations by governmental agencies and the CDC due to the threat of the spread of communicable disease and the presence thereon, as further described herein.

170. The Policy provides Communicable Disease Coverage which states: "This policy will pay for: (b) direct physical loss or damage to insured property caused by or resulting from a . . . communicable disease event at an insured location[.]"

171. The ACE Policy removes the Interruption by Communicable Disease and Communicable Disease coverages and replaces them with a Communicable Disease Additional Coverage Endorsement ("ACE Disease Endorsement"). The ACE Disease Endorsement covers "[t]he reasonable and necessary cost of the cleanup, removal, disposal, and/or decontamination of property at the insured location contaminated by contact with actual, not threatened, communicable disease, all in a manner required to satisfy any order of the applicable public authority;" and "[t]he actual loss sustained by the Insured of business income or gross profits, as defined and covered elsewhere in this Policy, and the extra expense incurred by the Insured, as defined and covered elsewhere in this Policy, resulting from the suspension of the Insured's operations during the Communicable Disease Period of Recovery." These coverages apply if "directly resulting from the actual or suspected presence of a communicable disease, the Insured's premises are totally or partially closed at the direction of The National Center for Disease Control and/or the applicable state, city or municipal department of public health."

172. COVID-19 is a communicable disease that was physically present on the EIIA Members' premises.

173. The EIIA Members have experienced interruption and interference with their business as a result of the presence of the Coronavirus and COVID-19 at their campuses and properties, including over: 27 Denison, 26 Kenyon, 6 OWU and 50 Wooster employees testing positive for COVID-19. Similarly, many students also tested positive for COVID-19, including: 52 Denison, 32 Kenyon, 162 OWU, and 152 Wooster students.

174. The EIIA Members' campuses and properties were also subject to complete and partial closure due to the threat of actual and suspected presence of hazardous conditions, namely

the presence of the Coronavirus and COVID-19.

175. The Policy provides Decontamination Costs coverage, which provides in relevant part: "If insured property is contaminated as a direct result of physical damage insured by this Policy and there is in force at the time of the loss any law or ordinance regulating Contamination due to the actual not suspected presence of Contaminant(s), then this Policy covers, as a direct result of enforcement of such law or ordinance, the increased cost of decontamination and/or removal of such contaminated insured property in a manner to satisfy such law or ordinance."

176. The Policy provides Protection and Preservation of Property coverage for the "reasonable and necessary costs incurred for actions to temporarily protect or preserve insured property; provided such actions are necessary due to actual, or to prevent immediately impending, insured physical loss or damage to such insured property."

177. The Policy provides Crisis Management coverage for "additional cost for communication response and actual loss of Gross Earnings and Extra Expense due to a covered crisis event.  Covered crisis event includes, . . . covered premises contaminated by communicable disease . . . ."

178. The Policy provides Loss Adjustment Expenses coverage for "expenses incurred by the Insured, or by the Insured's representatives of reasonable fees payable to the Insured's accountants, architects, auditors, engineers, or other professionals and the cost of using the Insured's employees, for producing and certifying any particulars . . . resulting from an insured loss payable under this policy."

179. The EIIA Members undertook costly measures necessary to protect from imminent and further loss or damage and to protect as much as possible, the health, safety and welfare of employees and customers.  These measures included, among other things, altering property to protect it from loss or damage, and taking measures to protect the safety of its employees and students, such as erecting barriers, altering air circulation, reconfiguring indoor spaces, disinfecting surfaces and materials, and providing PPE to employees.  Among other things, the EIIA Members incurred costs associated with securing, storing and arranging student retrieval of

personal property left behind by students required to unexpectedly depart the EIIA Members' campuses as a result of the Coronavirus, COVID-19 and governmental orders.

### *Time Element Extensions*

180.     The Policy includes numerous Time Element Extensions that apply to the EIIA Members' losses from the Coronavirus and COVID-19.

181.     The Policy provides Interruption by Civil or Military Authority coverage for "the loss sustained during the period of time, not to exceed 30 days, when access to real or personal property is impaired by order or action of civil or military authority issued in connection with or following a peril insured against."

182.     The Coronavirus and COVID-19 caused loss or damage to property throughout Ohio, and caused the deprivation of use of such property, giving rise to the actions of civil authority, as set forth herein.  These orders impaired access to the EIIA Members' campuses and properties.

183.     The Policy provides Contingent Time Element coverage for "loss resulting from damage to or destruction by, causes of loss insured against, to property that wholly or partially prevents any direct supplier of goods and/or services to the Insured from rendering their goods and/or services, or property that wholly or partially prevents any direct receiver of goods and/or services from the Insured from accepting the Insured's goods and/or services, such supplier or receiver to be located anywhere in the world."

184.     The Policy provides Leader Property coverage for "loss sustained during the period of time, not to exceed 30 days, resulting from damage to or destruction by, causes of loss insured against, to property not owned or operated by the Insured, located in the same vicinity as the Insured, which attracts business to the Insured."

185.     In plain English, the Policy provides coverage for the EIIA Members' losses if the properties of the EIIA Members' direct suppliers, or nearby properties that attract business to the EIIA Members, suffer loss, damage or destruction unless expressly excluded under the Policy.

41

The Policy cover all risks of loss and does not contain any relevant exclusions for the EIIA Members' losses.

186.    Among other things, as set forth herein, the Coronavirus and COVID-19 caused loss, damage or destruction at properties of direct suppliers and service providers to the EIIA Members, and properties that attract customers to the EIIA Members' campuses.

187.    Additionally, as set forth herein, the Coronavirus and COVID-19 rendered such properties unfit and unsafe for their normal usages, resulting in the deprivation of use of such properties.

188.    The Policy provides Ingress/Egress coverage for "the loss sustained during the period of time, not to exceed 30 days, when in connection with or following a peril insured against, access to or egress from real or personal property is impaired."

189.    The Coronavirus and COVID-19 caused loss or damage to property throughout Ohio, and caused the deprivation of use of such property. The areas at and surrounding the EIIA Members' campuses and properties were non-viable destinations in general, thus preventing access to the campuses.

### *The Other Program Insurance Policies*

190.    The policy issued by Beazley, Policy No. W2205F200301 (the "Beazley Primary Policy"), provides a 10% share of the $50,000,000 primary layer of coverage (attached hereto as Ex. 1).

191.    The policy issued by GuideOne, Policy No. 099000107 (the "GuideOne Primary Policy"), provides a 1% share of the $50,000,000 primary layer of coverage (attached hereto as Ex. 2).

192.    The policy issued by Colony, Policy No. BPR200033-0 (the "Colony Primary Policy"), provides a 29% share of the $10,000,000 primary layer of coverage (attached hereto as Ex. 3).

193.    The policy issued by ACE, Policy No. GPA D42260526 002 (the "ACE Policy"), provides a 30% share of the $10,000,000 primary layer of coverage (attached hereto as Ex. 4).

194.    The policy issued by Starr, Policy No. SLSTPTY11266120 (the "Starr Policy"), provides a 30% share of the $10,000,000 primary layer of coverage, a 10% share of the $40,000,000 excess of $10,000,000 layer of coverage, and a 45% share of the $100,000,000 excess of $250,000,000 layer of coverage (attached hereto as Ex. 5).

195.    The policy issued by Arch, Policy No. ESP0053735-07 (the "Arch Policy"), provides a 12.5% share of the $40,000,000 excess of $10,000,000 layer of coverage (attached hereto as Ex. 6).

196.    The policy issued by Evanston, Policy No. MKLV12XP003343 (the "Evanston Policy"), provides a 5% share of the $40,000,000 excess of $10,000,000 layer of coverage, and a 5% share of the $100,000,000 excess of $150,000,000 layer of coverage (attached hereto as Ex. 7).

197.    The policy issued by Lloyd's, Policy No. B080110908U20 (the "Lloyd's Excess Policy"), provides a 25.5% share of the $40,000,000 excess of $10,000,000 layer of coverage, a 19.5% share of the $100,000,000 excess of $50,000,000 layer of coverage, and a 5% share of the $100,000,000 excess of $250,000,000 layer of coverage (attached hereto as Ex. 8).

198.    The policy issued by Ategrity, Policy No. 01-B-XP-P00000106-1 (the "Ategrity Policy"), provides an 15% share of the $40,000,000 excess of $10,000,000 layer of coverage (attached hereto as Ex. 9).

199.    The policy issued by Colony, Policy No. XP200034-0 (the "Colony Excess Policy"), provides an 8.5% share of the $40,000,000 excess of $10,000,000 layer of coverage (attached hereto as Ex. 10).

200.    The policy issued by HDI, Policy No. CPXD5460202 (the "HDI Policy"), provides a 12.5% share of the $340,000,000 excess of $10,000,000 layer of coverage (attached hereto as Ex. 11).

201.    The policy issued by Princeton, Policy No. 78-A3-XP-0000488-02 (the "Princeton Policy"), provides a 7.5% share of the $100,000,000 excess of $50,000,000 layer of coverage, and a 22.5% share of the $100,000,000 excess of $150,000,000 layer of coverage (attached hereto as

Ex. 12).

202. The policy issued by Liberty Specialty Markets Bermuda Limited, Policy No. LSMAPR105580A01 (the "Liberty Policy"), provides a 4.5% share of the $100,000,000 excess of $50,000,000 layer of coverage. The Liberty Policy contains an arbitration clause and, as such, Liberty Specialty Markets Bermuda Limited is not named in this action.

203. The policy issued by GuideOne, Policy No. 099000119 (the "GuideOne Excess Policy(1)"), provides an 11% share of the $100,000,000 excess of $50,000,000 layer of coverage (attached hereto as Ex. 13).

204. The policy issued by Markel Bermuda Limited, Policy No. 1417657-11178-PRMAN-2020 (the "Markel Policy"), provides a 10% share of the $100,000,000 excess of $50,000,000 layer of coverage. The Markel Policy contains an arbitration clause and, as such, Markel Bermuda Limited is not named in this action.

205. The policy issued by Endurance, Policy No. ARP10010732903 (the "Endurance Policy"), provides a 10% share of the $200,000,000 excess of $50,000,000 layer of coverage (attached hereto as Ex. 14).

206. The policy issued by Tokio Marine, Policy No. LCP6480578-03 (the "Tokio Marine Policy"), provides a 10% share of the $200,000,000 excess of $50,000,000 layer of coverage (attached hereto as Ex. 15).

207. The policy issued by Westport, Policy No. NAP 0451682 06 (the "Westport Policy"), provides a 10% share of the $200,000,000 excess of $50,000,000 layer of coverage (attached hereto as Ex. 16).

208. The policy issued by Argo Re Ltd., Policy No. P141584 (the "Argo Policy"), provides a 5% share of the $200,000,000 excess of $50,000,000 layer of coverage. The Argo Policy contains an arbitration clause and, as such, Argo Re Ltd.is not named in this action.

209. The policy issued by GuideOne, Policy No. 099000120 (the "GuideOne Excess Policy(2)"), provides a 20% share of the $100,000,000 excess of $150,000,000 layer of coverage (attached hereto as Ex. 17).

210.    The policy issued by Hamilton Re, Ltd., Policy No. PX20-3891-01 (the "Hamilton Policy"), provides a 5% share of the $100,000,000 excess of $150,000,000 layer of coverage. The Hamilton Policy contains an arbitration clause and, as such, Hamilton Re, Ltd.is not named in this action.

211.    The policy issued by Mitsui, Policy No. EXP7000138 (the "Mitsui Policy"), provides a 37.5% share of the $100,000,000 excess of $250,000,000 layer of coverage (attached hereto as Ex. 18).

212.    The policy issued by Homeland, Policy No. 795011830 (the "Homeland Policy"), provides a 28% share of the 350,000,000 excess of $350,000,000 layer of coverage (attached hereto as Ex. 19).

213.    The policy issued by XL Bermuda Ltd., Policy No. XL PRP 1373773 20 (the "XL Policy"), provides a 30% share of the $350,000,000 excess of $350,000,000 layer of coverage. The XL Policy contains an arbitration clause and, as such, XL Bermuda Ltd. is not named in this action.

214.    The policy issued by Chubb Bermuda Limited, Policy No. EIIA01659P01 (the "Chubb Policy"), provides a 42% share of the $350,000,000 excess of $350,000,000 layer of coverage, and a 100% share of the $500,000,000 excess of $700,000,000 layer of coverage. The Chubb Policy contains an arbitration clause and, as such, Chubb Bermuda Limited is not named in this action.

**G.    Defendant Insurers Denied The EIIA Members' Claims**

215.    The EIIA Members timely have provided notice to Defendant Insurers of their losses from the Coronavirus and COVID-19 (collectively the "EIIA Members' Claims").

216.    Defendant Insurers never sent an adjuster – or anyone on their behalf – to visit, inspect or set foot in any of the EIIA Members' locations or properties to investigate the EIIA Members' Claims.

217.    Defendant Insurers have not conducted any investigation of the EIIA Members'

Claims.

218.     Defendant Insurers have either reserved their rights to deny coverage, denied coverage or failed to timely acknowledge or deny coverage for the EIIA Members' Claims, forcing the EIIA Members to face substantial unreimbursed losses.

219.     Upon information and belief, Defendant Insurers contend that their promise to pay for loss is strictly limited to property that undergoes a tangible, permanent alteration or transformation as a result of an external force, as might be the case when a fire burns a piece of wood.  But the coverage provided under the Policy is not so narrowly circumscribed; its coverage expressly extends to "all risk of direct physical loss of or damage to property" unless excluded, "direct physical loss or damage," and "loss, damage, or destruction," including the inability to access or use all or a portion of the insured locations.

220.     To the extent applicable to the coverages afforded by the Policy, the requirement of "physical loss of or damage," "physical loss or damage," or "loss, damage, or destruction" to property has been met in one or more ways as alleged herein, including by virtue of the loss or damage to the EIIA Members' qualifying property caused by (i) the actual or potential presence of the Coronavirus in the air (whether in droplet nuclei, aerosols, droplets, or otherwise) and on surfaces such as door handles, desks, chairs, computers and educational equipment at such properties; (ii) the necessity of modifying physical behaviors through the use of social distancing in order to reduce or minimize the potential for viral transmission, as well as the necessity of physically modifying interior spaces; (iii) government orders requiring that physical spaces, be shut down, or restricting the use of such physical spaces, as was the case with the prohibition on in-person classes; and/or (iv) the need to mitigate the threat or actual physical presence of the Coronavirus on door handles, desks, chairs, computers, educational equipment, and assorted surfaces, as well as in heating and air conditioning systems and any other of the multitude of places virus has or could be found.

221.     Defendant Insurers have denied, or constructively denied, coverage despite never visiting or sending an adjuster to any of the EIIA Members' institutions to verify the accuracy of

their position.

222. Defendant Insurers' denial or constructive denial of the EIIA Members' Claims without conducting a substantive investigation of such claim constitutes a breach of the duty of good faith and fair dealing an insurer owes to its insured. In so doing, Defendant Insurers placed their own interests above those of their policyholders.

223. Defendant Insurers' position is particularly egregious in light of the fact that they have repeatedly acknowledged the possibility of massive losses from pandemics. For example, Chubb Limited ("Chubb"), ACE's parent corporation, acknowledged the possibility of massive losses from pandemics in its own public filings for years. In its 2019 Form 10-K, Chubb Limited acknowledged "We have substantial exposure to losses resulting from . . . catastrophic events, including pandemics."[100] Chubb also routinely stated in its annual filings that the risk factors to the Chubb Group of Companies included "infection rates and severity of pandemics and their effects on our business operations and claims activity."[101]

224. Similarly, the corporate parent of Evanston, Markel Insurance Company, acknowledged in the "Risk Factors" section of its 10-K that "[a]s a company with significant property and casualty insurance operations, we may experience losses from man-made or natural catastrophes. Catastrophes . . . may include pandemics."[102]

225. *After* the Policies were issued to the EIIA Members and *after* the scope and severity of the Coronavirus and COVID-19 became clear, Defendant Insurers sought *future* changes to the Policies to eliminate coverages expressly covering the losses at issue in this action. Among other changes, Defendant Insurers indicated that they would remove all Nonphysical Damage coverage terms, remove coverage for Contaminated Food or Water / Communicable Disease (COVID-19),

---

[100] *See, e.g.*, 2019 Form 10-K of Chubb Limited, at 19, https://s1.q4cdn.com/677769242/files/doc_financials/2020/ar/Chubb-Limited-2019-Form-10-K.pdf (last visited Mar. 5, 2021).

[101] *Id.* at 36.

[102] 2019 Form 10-K of Markel Insurance Company, at 25, https://www.sec.gov/Archives/edgar/data/1096343/000109634320000039/mkl1231201910k.htm (last visited Mar. 5, 2021).

and remove coverage for Interruption caused by Communicable Disease.

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment)

226.    The EIIA Members incorporate the above Paragraphs by reference.

227.    This is a claim for relief for declaratory judgment pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. §2201.  An actual and justiciable controversy exists between the EIIA Members and Defendant Insurers concerning their respective rights and obligations under the Policies.

228.    The issuance of declaratory relief will terminate the controversy between the EIIA Members and Defendant Insurers that gave rise to this action.

229.    As such, this Court has the authority to issue a declaratory judgment concerning the respective rights and obligations of the EIIA Members and Defendant Insurers under the Policies.

230.    The EIIA Members seek a declaratory judgment declaring that the Policies cover the losses they have suffered.

231.    The EIIA Members seek a declaratory judgment declaring that Defendant Insurers are responsible for fully and timely paying the EIIA Members' Claims.

232.    The burden of proof is upon Defendant Insurers to demonstrate that coverage is limited in any way under the Policies.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract)

233.    The EIIA Members incorporate the above Paragraphs by reference.

234.    The Policies are valid and enforceable contracts.

235.    The EIIA Members paid substantial premiums for the Policies and the promises of coverage contained therein, and otherwise performed all of their obligations owed under the Policies or were excused from performance.

236.    Defendant Insurers have denied the EIIA Members' Claims and have refused to pay or otherwise honor their promises.  In denying or constructively denying coverage for the EIIA Members' Claims as alleged above, Defendant Insurers breached their contracts (that is, the

Policies). As a result, the EIIA Members have suffered and continue to suffer damage in an amount to be proven at trial, but currently estimated to exceed millions in damages.

237. By failing to investigate the EIIA Members' Claims, Defendant Insurers breached their duty of good faith and fair dealing to their insureds. As a result, the EIIA Members are entitled to consequential damages for Defendant Insurers' breach of the Policies.

238. Consequential damages for breach of the Policies were reasonably contemplated by the parties when Defendant Insurers issued the Policies.

## **PRAYER FOR RELIEF**

Wherefore, the EIIA Members respectfully request that the Court enter Judgment in their favor against Defendant Insurers as follows:

A. On the First Cause of Action, a declaratory judgment that the losses the EIIA Members have suffered are covered by the Policies and that Defendant Insurers are responsible for fully and timely paying the EIIA Members' losses;

B. On the Second Cause of Action, for an award of damages in favor of the EIIA Members in an amount to be proven at trial, plus pre- and post-judgment interest at the maximum legal rate, attorneys' fees, costs and disbursements for this action; and

C. Such other equitable and further relief as this Court deems just and proper.

Date: March 10, 2021

Respectfully submitted,

 /s/ Erik J. Clark
Shawn J. Organ (0042052)
Erik J. Clark (0078732)*
      *Trial Attorney*
**Organ Law llp**
1330 Dublin Road
Columbus, Ohio 43215
614.481.0900
614.481.0904 (f)
sjorgan@organlegal.com
ejclark@organlegal.com

Joseph D. Jean (*Pro Hac Vice Application Forthcoming*)
Alexander D. Hardiman (*Pro Hac Vice Application Forthcoming*)
Janine M. Stanisz (*Pro Hac Vice Application Forthcoming*)
Arthur H. Aizley (*Pro Hac Vice Application Forthcoming*)
PILLSBURY WINTHROP SHAW PITTMAN LLP
31 West 52nd Street
New York, New York 10019
Tel: (212) 858-1000
Fax: (212) 858-1500
joseph.jean@pillsburylaw.com
alexander.hardiman@pillsburylaw.com
janine.stanisz@pillsburylaw.com
arthur.aizley@pillsburylaw.com

Peter M. Gillon (*Pro Hac Vice Application Forthcoming*)
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street NW
Washington, DC 20036-3006
Tel: (202) 663-8000
Fax: (202) 663-8007
Peter.gillon@pillsburylaw.com

*Attorneys for Plaintiffs Denison University, Kenyon College, Ohio Wesleyan University, and The College of Wooster*

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury on all triable issues.

  /s/ Erik J. Clark
Erik J. Clark